# THE STATE ex rel. JESSE W. BARRETT v. GEORGE C. HITCHCOCK et al., Judges of the Circuit Court of the City of St. Louis.

### In Banc, March 28, 1912.

1. **SENATORIAL DISTRICTS: Division of State Into: Legislative In Character: State Officers Legislative Body.** The districting of the State into legislative, senatorial, congressional and judicial districts is the exercise of legislative authority; and the Governor, Secretary of State and Attorney-General, when assembled in obedience to the Constitution to divide the State into senatorial districts, after the failure of the General Assembly to do so, become a legislative body, and their acts in that behalf are the exercise of a legislative function. They cannot, therefore, be compelled by mandamus to divide the State into senatorial districts.

2. ———: ———: **By State Officers: Three Essentials.** After a division of the State into senatorial districts has been agreed upon by the Governor, Secretary of State and Attorney-General, and reduced to writing, the Constitution requires three other things to be done before the "statement" shall become effective, namely: first, the members of the body must sign the statement; second, it must be authenticated by the Great Seal of the State and filed in the office of the Secretary of State; and, third, proclamation thereof must be made by the Governor.

3. ———: ———: ———: **Signed by Quorum.** A majority of the three officers authorized by the Constitution to divide the State into senatorial districts, when legally assembled, constitute a quorum to transact business, and a "statement" signed by two of them is legally signed by "the members" within the meaning of the requirement of the Constitution.

4. ———: ———: ———: **Promulgation by Governor: Directory Requirement.** The words of the Constitution declaring that "upon the proclamation of the Governor" a division of the State into senatorial districts made by the Governor, Secretary of State and Attorney-General "shall be binding and effective as if done by the General Assembly," is mandatory, and not merely directory. This court is firmly wedded to the doctrine that constitutional requirements are mandatory rather than directory. It will not undertake to amend the Constitution by whittling it away piecemeal.

5. ———: ———: ———: ———: **Conforms to Other Legislative Requirements.** The said constitutional provision conforms to the general idea that all forms of legislation are supposed to meet with the Governor's approval.

241 Mo.—28

State ex rel. v. Hitchcock.

6. ————: ————: ————: ————: Meaning of the Word Upon. The word "upon" used in the constitutional provision declaring that "upon the proclamation of the Governor" a division of the State into senatorial districts made by the Governor, Secretary of State and Attorney-General "shall be as binding and effective as if done by the General Assembly," means that the statement or division shall become effective "upon the occasion of," "following upon," "because of," "by reason of," "after and in consequence of" the Governor's proclamation; and that in effect is stating that it shall not become effective until proclamation thereof is made by him.

7. ————: ————: ————: ————: Presumption that Proclamation was Made. The language of the Constitution implies an actual proclamation by the Governor—not one by the Attorney-General and Secretary of State. Because the Secretary of State and Attorney-General made up a statement dividing the State into senatorial districts, signed it, and the Great Seal of the State was attached thereto and it was filed in the office of the Secretary of State, as the constitutional provision requires, it will not be presumed that proclamation thereof was made, or that the legal effect was the same as if proclamation had been actually made, in the face of the fact that the Governor did not sign the statement, did not concur in anything that was done, and has persistently refused to make public proclamation of what was done.

8. ————: ————: Discretionary and Non-Discretionary Powers: Compact: Contiguous, etc. In the division of the State into senatorial districts the Legislature, or the officers authorized to act upon its failure to act, has no discretion as to three important matters: 1st, as to the number of districts, for there must be 34; 2nd, when a district is to be composed of more than one county, they must be contiguous; and, 3rd, when a district is composed of more than one county, no county shall be divided. The Legislature may exercise a discretion in two matters: 1st, each district is to be made as nearly equal in population as practical, and, 2nd, when a district is to be composed of more than two counties, it shall be as compact as it may reasonably be made; but even that discretion is limited.

9. ————: ————: Abuse of Discretion: Unequal Population. Where the population of the State is 3,293,336 and the number of senatorial districts is 34, making the ratio 96,862, and the Constitution requires the population of each district to be "as nearly equal as may be," an apportionment that gives to the city of St. Louis, having a population of 687,029, only six senators, thereby leaving 105,867 persons unrepresented, is an abuse of the legislative limited discretion, and is null and void. But the apportionment of three senators to Jackson county, which had a population of 283,522, was not an abuse of that discretion, for, since no county can be divided, to give it only two would leave a surplus population of 89,798.

State ex rel. v. Hitchcock.

10. ———: ———: ———: **Compactness.** Variation in population of the districts, even to the amount of several thousand, will not alone render the apportionment invalid. But where the constitutional requirements both as to equality of population and compactness of territory have not been observed, it is invalid. The counties must be contiguous and as compact as the nature of the work will reasonably permit.

11. ———: ———: **Circuit Court: Action Coerced by Mandamus.** The power vested by the Constitution in the circuit court of the city of St. Louis to divide the city into as many senatorial districts as there have been apportioned senators to the city by the General Assembly, or on its failure to divide the State, by the three State officers, is legislative in character, and if that court refuses to exercise that power the Supreme Court cannot by mandamus compel it to act, any more than it can compel the General Assembly to act.

12. ———: ———: **By State Officers: Coerced by Mandamus.** *Held*, by VALLIANT, C. J., that the power imposed upon the Governor, Secretary of State and Attorney-General, upon the failure of the General Assembly to divide the State into senatorial districts, "to perform said duty," is legislative in character; and the courts have no power by mandamus to compel them to perform said duty, or to review their act when performed, or to pronounce it a compliance with or a violation of the mandates of the Constitution stating how said districts shall be constituted. The provisions which specifically forbid the exercise or attempted exercise by one department of the government of powers devolved upon another impede any attempt by the court to compel legislative action. The Supreme Court has no jurisdiction by a mandamus suit to compel the circuit court of the city of St. Louis to divide the city into as many districts as the State officers have apportioned to that city, or to determine the validity of the division of the State into senatorial districts made by those officers.

13. ———: ———: ———: **Dividing City into Districts: Circuit Court Compelled by Mandamus: Jurisdiction.** *Held*, by VALLIANT, C. J., that the provisions of the Constitution, declaring that "when any county shall be entitled to more than one senator, the circuit court shall cause such county to be divided into districts of compact and contiguous territory," etc., vest the circuit court with legislative power, and the Supreme Court cannot by writ of mandamus compel that court to perform that duty, nor does it have anything to do with the judges' reasons for refusing to do it. The circuit court in performing the duty does not act in a judicial capacity. No parties litigant, having personal rights to be adjudged or official duties to be directed, are required to appear, but the judges composing the circuit court come together of their own motion and perform a legislative function imposed upon them, finally and exclusively, by

the Constitution. The Supreme Court has no jurisdiction to compel the circuit judges to divide the city into senatorial districts.

14. ———: ———: ———: ———: ———: ———: Both agreeing to Court's Jurisdiction. *Held*, by VALLIANT, C. J., that courts do not render judgments that will depend for satisfaction on the pleasure or complaisance of the parties against whom the judgment is rendered. Though all parties express a willingness to bow to the opinion rendered by the court, it cannot render judgment if it has no jurisdiction of the cause.

15. ———: ———: ———: ———: ———: Obiter Dictum. *Held*, by GRAVES, J., that the constitutional power vested in the circuit court of the city of St. Louis to divide the city into as many senatorial districts as there have been apportioned senators to the city by the General Assembly, or by the three State officers, is purely a legislative function, and the Supreme Court cannot compel the judges of that court to perform that duty, and has nothing to do with their reasons for refusing to perform it; *and*, as the majority opinion specifically holds that the Supreme Court is, on that account, without jurisdiction to compel the circuit judges to act, all of the majority opinion that discusses the validity of the apportionment as made by the three State officers, is *obiter dictum*, pure and simple, and binding on no cne.

## Mandamus.

WRIT DENIED.

*W. C. Irwin* for relator.

(1) Under section 3 of article 4 of the Constitution, the Supreme Court has jurisdiction to compel the judges of the circuit court of the city of St. Louis to subdivide said city into senatorial districts under an apportionment made in accordance with section 7 of article 4 of the Constitution, where the circuit judges refuse to perform the duty imposed upon them by section 6 of article 4 of the Constitution. State ex rel. v. Higgins, 125 Mo. 364; State ex rel. v. Patterson, 229 Mo. 364; State ex rel. v. Patterson, 229 Mo. 373; People ex rel. v. Broom, 138 N. Y. 95; State ex rel. v. Smith, 105 Mo. 6; State ex rel. v. Field, 107 Mo. 445; State ex rel. v. Jones, 155 Mo. 570; State ex rel. v. Smith, 172 Mo. 446; State ex rel. v. Broaddus, 207 Mo. 107. The

Supreme Court has jurisdiction by its writ of mandamus to compel the judges of the circuit court to act where it appears that the inferior court has refused to perform its duty. State ex rel. v. Turner, 210 Mo. 77; State ex rel. v. McCamman, 11 Mo. App. 626; State ex rel. v. Smith, 105 Mo. 6; State ex rel. v. Neville, 157 Mo. 386; State ex rel. v. O'Bryan, 102 Mo. 254; State ex rel. v. Oliver, 50 Mo. App. 217; State ex rel. v. County, 41 Mo. 221; State ex rel. v. Field, 37 Mo. App. 83. And it is immaterial in the case at bar whether the act which the circuit judges are required to perform is a legislative, ministerial or judicial duty, in as much as the power is conferred upon the Supreme court by express constitutional grant. Constitution, sec. 3, art. 6; State ex rel. v. Higgins, 125 Mo. 364; State ex rel. v. Patterson, 229 Mo. 364; State ex rel. v. Patterson, 229 Mo. 373; State ex rel. v. Broom, 138 N. Y. 95. (2) Under sec. 7, art. 4 of the Constitution, in the event of the failure of the General Assembly to district the State for senators, the duty devolves upon the Governor, Secretary of State and Attorney-General, and if all three officers are present, a statement of the senatorial districts formed, signed and filed in the office of the Secretary of State by the Secretary of State and Attorney-General, constituting a majority of such officers, and attested by the Great Seal of the State, has the same force and effect as if done by all three officers. 29 Cyc. 1433; In re State Treasurer, 51 Neb. 116. The rule is well settled that, where authority is conferred by law upon three or more persons to execute a public trust or agency, and in the execution therof all are assembled to deliberate, or had notice or opportunity to be present, the act of a majority is binding unless the statute expressly requires the concurrent action of all. In re State Treasurer, 51 Neb. 116; People v. Coghill, 47 Cal. 361; State v. Wilksville, 20 Ohio St. 288; State v. James, 4 Wis. 408; Hopkins v. Scott, 38 Neb. 661; State

v. Bemis, 45 Neb. 724; Williams v. School, 21 Pick. (Mass.) 75; Lank v. Wood, 15 Ill. 256; People v. Nichols, 52 N. Y. 478. When the Governor refuses to participate in the forming, filing, and signing of a statement of the senatorial districts and the same are formed by the Secretary of State and Attorney-General, who filed in the office of the Secretary a statement of the districts signed by them and attested by the Great Seal of the State, and the Governor refuses to proclaim the statement, the proclamation of the Governor is not necessary in order that the statement shall be binding and effectual. 36 Cyc. 966; State v. Click, 2 Ala. 26; Peterman v. Huling, 31 Pa. St. 432; County v. County, 15 Lea (Tenn.), 266. The officer upon whom rests the duty of making a proclamation is conclusively presumed to have promptly and properly discharged that duty. Lepeyre v. United States, 17 Wall. 195; Walsey v. Chapman, 101 U. S. 770. The court conclusively presumes that the proclamation was made on the day it should have been made and will permit no inquiry into extrinsic matters. Lepeyre v. United States, 17 Wall. (U. S.) 195; Walsey v. Chapman, 101 U. S. 770.

*Rassieur & Schnurmacher, Jones, Jones, Hocker & Davis* and *Alroy S. Phillips* for respondents.

(1) The statement of the senatorial districts formed by the Governor, Secretary of State, and Attorney-General and filed in the office of the Secretary of State in accordance with sec. 7, art. 4 of the constitution, when proclaimed by the Governor, has the same status as an act of the General Assembly, and is subject to the same rules as a statute as to its construction and validity, and where the judges of the circuit court, city of St. Louis, refuse to proceed in accordance with the duty imposed upon them by sec. 6, art. 4 of the Constitution to subdivide the city into suitable districts thereunder, on the ground that the apportion-

ment contained in the statement is unconstitutional, a proceeding by mandamus to compel them to subdivide the city into suitable districts under the statement, is a proper proceeding in which to pass upon the validity and constitutionality of the statement. Constitution, art. 4, secs. 2, 6, 7, 25; Laws 1882, p. 4; Laws 1892, p. 15; Laws 1901, p. 204; State ex rel. v. Patterson, 229 Mo. 373; State ex rel. v. Roach, 230 Mo. 408; State ex rel. v. Ziegenhein, 144 Mo. 283; State ex rel. v. Warner, 197 Mo. 650, State ex rel. v. Gordon, 236 Mo. 164; State ex rel. v. Roach, 230 Mo. 408; State ex rel. v. Messerly, 198 Mo. 351; State ex rel. v. Nast, 209 Mo. 708; People ex rel. v. Rice, 135 N. Y. 473; People ex rel. v. Supervisors, 147 N. Y. 1. (2) Under the provisions of sec. 7, art. 4 of the Constitution, the statement of the senatorial districts formed by the Secretary of State and Attorney-General and filed in the office of the Secretary of State on April 18, 1911, does not become binding and effectual until proclaimed by the Governor, and in the absence of such proclamation the statement is not binding and effectual and imposes no duty upon the judges of the circuit court, city of St. Louis, to subdivide the city into suitable districts thereunder. 4 Words & Phrases, 4962; 36 Cyc. 965, 1190-1200; Forry v. Ridge, 56 Mo. App. 618. (3) In passing upon the validity of an apportionment of the State for senators made by the General Assembly the courts will not consider the motives of the General Assembly, but will declare the act unconstitutional and void where it plainly appears that in forming the districts the General Assembly has not considered or applied at all to any extent the limitations imposed by article 4 of the Constitution upon the exercise of discretion, or has so grossly abused the discretion to such an extent as to show an entire disregard of the limitations. Where the apportionment is made by the Governor, Secretary of State and Attorney-General, they act in that capacity as public officers and not as a sovereign legislative

body, and the courts will consider their partisan motive and declare their apportionment unconstitutional and void where it plainly appears that they exercised their discretion in an arbitrary, capricious or unreasonable manner for partisan purposes. Constitution, art. 4, secs. 5, 6, 7, 9, 10, 11; People v. Thompson, 155 Ill. 451; People v. Carlock, 198 Ill. 150; People ex rel. v. Rice, 135 N. Y. 473; People ex rel. v. Broom, 138 N. Y. 95; Sherrill v. O'Brien, 188 N. Y. 185; State ex rel. v. Cunningham, 81 Wis. 440; State ex rel. v. Cunningham, 83 Wis. 90; Giddings v. Blacker, 93 Mich. 1; Supervisors v. Blacker, 92 Mich. 638; Parker v. State, 133 Ind. 178; Denny v. State, 144 Ind. 503; Brooks v. State, 162 Ind. 568; State ex rel. v. Wrighton, 56 N. J. L. 126; Harmison v. Commissioners, 45 W. Va. 179; People ex rel. v. Rice, 135 N. Y. 500; People v. Thompson, 155 Ill. 451; Kansas City v. Hyde, 196 Mo. 498; State ex rel. v. Philips, 97 Mo. 331; State ex rel. v. Gibson, 187 Mo. 536; State ex rel. v. Board, 103 Mo. 22; State ex rel. v. Adcock, 206 Mo. 550; State ex rel. v. Bourne, 151 Mo. App. 104, State ex rel. v. Board, 134 Mo. 296. (4) The facts in the case at bar are sufficient not only to show that in forming the districts the Secretary of State and Attorney-General exercised their discretion in an arbitrary, capricious and unreasonable manner for partisan purposes, but also to show that they have not considered or applied at all to any extent the limitations imposed by article 4 of the Constitution upon the exercise of their discretion and have so grossly abused their discretion as to show an entire disregard of its limitations. People v. Thompson, 155 Ill. 451; State ex rel. v. Cunningham, 81 Wis. 440; Sherrill v. O'Brien, 188 N. Y. 185; Parker v. State ex rel., 133 Ind. 178; People ex rel. v. Broom, 138 N. Y. 95; Giddings v. Blacker, 93 Mich. 1; State ex rel. v. Cunningham, 83 Wis. 90; State ex rel. v. Cunningham, 81 Wis. 440; People v. Rose, 203 Ill. 46; State ex rel. v. Board, 134 Mo. 296.

WOODSON, J.—This is an original proceeding by mandamus, instituted in this court by the relator, seeking to compel the respondents, the judges of the circuit court of the city of St. Louis, to apportion or redistrict said city into six senatorial districts as is required to be done under certain conditions, by section 7, article 4 of the Constitution of 1875.

A petition for an alternative writ of mandamus was filed, and after due consideration it was ordered to issue, and it was made returnable January 2, 1912. The writ was issued and duly served; and upon the return day, the respondents filed their return.

Upon the incoming of the return, the relator filed a motion for judgment on the pleadings; and it will therefore be necessary for a proper understanding of the case to set out the alternative writ, the return and the motion for judgment.

The writ is as follows (formal parts omited):

"Your petitioner, Jesse W. Barrett, relator herein, respectfully represents that he is a citizen, resident and taxpayer of the city of St. Louis, Missouri, and is a qualified elector in the Fifth precinct of the Twenty-eighth ward of said city, and in the Thirty-second senatorial district of Missouri; and that respondents George C. Hitchcock, J. Hugo Grimm, Daniel D. Fisher, Hugo Muench, George H. Shields, William B. Homer, Charles C. Allen, William M. Kinsey, James E. Withrow, Eugene McQuillin, Leo S. Rassieur and Wilson A. Taylor, are the duly elected, qualified and acting judges constituting the circuit court, city of St. Louis, Missouri.

"Your petitioner respectfully represents that in the year 1910, there was taken the thirteenth decennial census of the United States, and the result thereof as to the State of Missouri was ascertained and made public on September 30, 1910, according to which the State of Missouri has a population of 3,293,335, and the city of St. Louis a population of 687,029; that the next

session of the General Assembly was duly held in the City of Jefferson, as is duly provided by law; that under the provisions of section 7 of article 4 of the Constitution of Missouri, it became the duty of said Forty-sixth General Assembly to revise and adjust the apportionment of the State of Missouri for senators on the basis of such census, but the said Forty-sixth General Assembly failed to district the State for senators as required in said section and adjourned on March 20, 1911, and under the terms of said section it then became the duty of the Governor, Secretary of State and Attorney-General within thirty days thereafter to perform the said duty; that on April 18, 1911, the Governor, Secrtary of State and Attorney-General met for this purpose, and in pursuance of said section of the Constitution the Secretary of State and Attorney-General apportioned the State for senators and filed in the office of Secretary of State a full statement of the districts formed by them, including the names of the counties embraced in each district and the numbers thereof, which statement was signed by the Secretary of State and the Attorney-General, was attested by the Great Seal of the State, and reads as follows:

" 'Statement of Apportionment of Senatorial Districts.                    April 18, 1911.

" 'This is to certify that on Tuesday, April 18, 1911, under the provisions of section 7, article 4 of the Constitution of the State of Missouri (the Legislature of the State of Missouri in its session next after the decennial census, 1910, of the United States, had been taken and the result thereof as to this State ascertained, being the regular session of the Forty-sixth General Assembly, having failed to apportion and district the State into senatorial districts), Herbert S. Hadley, Governor of the State of Missouri, Cornelius Roach, Secretary of State of the State of Missouri, and Elliott W. Major, Attorney-General of the State of

Missouri, having had the matter under consideration, did district the State of Missouri for senators and divide said State into thirty-four senatorial districts, as follows:

" 'First District: The counties of Atchison, Gentry, Nodaway and Worth.

" 'Second District: The county of Buchanan.

" 'Third District: The counties of Andrew, Clay, Clinton, DeKalb, Holt and Platte.

" 'Fourth District: The counties of Grundy, Harrison, Mercer and Putnam.

" 'Fifth, Seventh and Nineteenth Districts: The county of Jackson.

" 'Sixth District: The counties of Chariton, Linn, Livingston and Sullivan.

" 'Eighth District: The counties of Caldwell, Carroll, Daviess and Ray.

" 'Ninth District: The counties of Macon, Marion, Randolph, and Shelby.

" 'Tenth District: The counties of Adair, Clark, Knox, Lewis, Schuyler and Scotland.

" 'Eleventh District: The counties of Lincoln, Pike, Ralls and St. Charles.

" 'Twelfth District: The counties of Boone, Callaway, Cole, Miller and Osage.

" 'Thirteenth District: The counties of Audrain, Gasconade, Monroe, Montgomery and Warren.

" 'Fourteenth District: The counties of Camden, Cooper, Howard, Moniteau, Morgan and Saline.

" 'Fifteenth District: The counties of Johnson, Lafayette and Pettis.

"Sixteenth District: The counties of Bates, Benton, Cass, Hickory and Henry.

" 'Seventeenth District: The counties of Barton, Cedar, Dade, St. Clair and Vernon.

" 'Eighteenth District: The counties of Christian, Greene, Stone, and Taney.

" 'Twentieth Disrict: The county of Jasper.

" 'Twenty-first District: The counties of Dallas, Douglas, Laclede, Ozark, Polk, Webster and Wright.

" 'Twenty-second District: The counties of Barry Lawrence, McDonald and Newton.

" 'Twenty-third District: The counties of Butler, Carter, Dunklin, Ripley and Wayne.

" 'Twenty-fourth District: The counties of Dent, Howell, Oregon, Shannon and Texas.

" 'Twenty-fifth District: The counties of Cape Girardeau, Mississippi, New Madrid, Pemiscot and Scott.

" 'Twenty-sixth District: The counties of Bollinger, Madison, Perry, St. Francois, Ste. Genevieve and Stoddard.

" 'Twenty-seventh District: The counties of St. Louis and Franklin.

" 'Twenty-eighth District: The counties of Crawford, Iron, Jefferson, Maries, Phelps, Pulaski, Reynolds and Washington.

" 'Twenty-ninth, Thirtieth, Thirty-first, Thirty-second, Thirty-third and Thirty-fourth Districts: The city of St. Louis.

" 'The said State of Missouri was districted for senators and divided into said thirty-four senatorial districts by the vote of Cornelius Roach, Secretary of State, and Elliott Major, Attorney-General, The Governor, Herbert S. Hadley, being present and refusing to vote and also refusing to sign this instrument districting the said State for senators, the same is therefore signed by said Cornelius Roach, Secretary of State, and said Elliott W. Major, Attorney-General, they constituting a working majority of those executive officers empowered under section 7, article 4, of the Constitution of the State of Missouri to perform the duty herein discharged.

" 'Done at the city of Jefferson, State of Missouri, the eighteenth day of April, in the year of our Lord one thousand nine hundred and eleven.'

"Your petitioner further respectfully represents that according to the said apportionment, the city of St. Louis is entitled to six senators, and under the provisions of section 6 of article 4 of the State Constitution, the duty is now imposed upon the circuit court, city of St. Louis, to cause the city to be subdivided into districts of compact and contiguous territory, and of population as nearly equal as may be, corresponding in number with the senators to which the city is entitled under said apportionment.

"Your petitioner further respectfully represents that the last subdivision of the city of St. Louis into senatorial districts was made by the circuit court, city of St. Louis, on November 6, 1901, under which the city was subdivided into six districts numbered from twenty-nine to thirty-four inclusive; that since said date the population of the Twenty-ninth district has increased from 95,161, to 152,348, that of the Thirtieth district has decreased from 94,176 to 88,238, that of the Thirty-first district had decreased from 100,929 to 60,568, that of the Thirty-second district has increased from 95,569 to 131,780, that of the Thirty-third has decreased from 94,771 to 90,398, and that of the Thirty-fourth district has increased from 94,732 to 163,762, so that there are now great inequalities in the population of the several senatorial districts of the city, and there is a great need of a new subdivision of the city into districts as nearly equal in population as may be, so as to give to your petitioner and each of the residents of the several districts his or their constitutional right to equality of representation in the State Senate.

"Your petitioner further respectfully represents that on November 29, 1911, he filed in the circuit court, city of St. Louis, a petition respectfully demanding that that court proceed to perform the duty imposed upon it by section 6, of article 4, of the State Constitution,

and subdivide the city of St. Louis under the said apportionment of 1911, into six districts of compact and contiguous territory, as nearly equal in population as may be, as is provided by law; that on December 1, 1911, he appeared before the said judges of said circuit court, in general term assembled, and presented his said petition; and that on December 9, 1911, the said judges of said circuit court, in general terms assembled ordered that the said statement of the districts be for naught held, and refused to perform the said duty on the ground that the apportionment contained in the said statement was unconstitutional, void and ineffectual and imposed no duty upon the said court.

"Your petitioner further respectfully represents that without the aid of this court, through its writ of mandamus, he has no remedy in the premises.

"Wherefore, your petitioner prays that this court issue its alternative writ of mandamus requiring and commanding the said George C. Hitchcock, J. Hugo Grimm, Daniel D. Fisher, Hugo Muench, George H. Shields, William B. Homer, Charles C. Allen, William M. Kinsey, James E. Withrow, Eugene McQuillin, Leo S. Rassieur and Wilson A. Taylor, as judges of the circuit court, city of St. Louis, Missouri, and each of them, without further excuse, refusal or delay, to proceed to perform the duty imposed upon said circuit court by section 6 of article 4 of the State Constiution, and subdivide the city of St. Louis under the statement of the senatorial districts filed in the office of the Secretary of State on April 18, 1911, into six districts of compact and contiguous territory as nearly equal in population as may be, as is provided by law, or that the said George C. Hitchock, J. Hugo Grimm, Daniel D. Fisher, Hugo Muench, George H. Shields, William D. Homer, Charles C. Allen, William M. Kinsey, James E. Withrow, Eugene McQuillin, Leo S. Rassieur and Wilson A. Taylor, as judges of the circuit

court, city of St. Louis, Missouri, appear before this court and show cause on a day certain, to be named in the writ, why they have not so done, and your petitioner further prays that he may have and recover of respondents his costs in this behalf expended and for such other and further relief as to the court may seem meet and proper in the premises.''

The return of respondents is as follows:

''Now come respondents George C. Hitchcock, J. Hugo Grimm, Daniel D. Fisher, Hugo Muench, George H. Shields, William B. Homer, Charles Claflin Allen, William M. Kinsey, James E. Withrow, Eugene McQuillin, Leo S. Rassieur, and Wilson A. Taylor, as judges of the circuit court, for the city of St. Louis, Missouri, and for their return to the alternative writ of mandamus, heretofore issued herein, respectively represent and show as follows:

''That at all the times mentioned in the petition respondents were and still are the duly elected, qualified and acting judges constituting the circuit court, city of St. Louis, Missouri:

''That on April 18, 1911, within thirty days after the adjournment of the Forty-sixth General Assembly of the State of Missouri, which failed to district the State for senators, the Governor, the Secretary of State and the Attorney-General of the State of Missouri, met at the city of Jefferson for the purpose of revising and adjusting the apportionment of the State for senators upon the basis of the United States census of 1910; that the Secretary of State then presented for adoption a statement dividing the State into senatorial districts, which he and the Attorney-general had previously prepared and agreed upon; that the Governor then and there objected to said statement, and to the adoption of the apportionment of the State into senatorial districts therein provided for, on the ground that it was unfair and partisan and did not comply with the requirements of the Constitution for the rea-

sons hereinafter set forth; that the Secretary of State and Attorney-General then refused to consider or approve any plan of apportionment other than the one upon which they had previously agreed, and upon the refusal of the Governor to sign or approve said statement, the Secretary of State and Attorney-General proceeded to organize the meeting for the purpose of adopting said statement of the districts, and nominated and elected each other chairman and secretary respectively of the meeting, the Governor declining to take any part in said organization on the ground, assigned by him, that the approval or disapproval by the Governor, Secretary of State and Attorney-General of any statement dividing the State into senatorial districts should be evidenced by the signing or refusal to sign any such statement, and on the further ground, assigned by him, that the Secretary of State and Attorney-General proposed to proceed in an arbitrary manner to adopt the statement of the districts upon which they had previously agreed as aforesaid, and thereupon, over the objection of the Governor, the Secretary of State and the Attorney-General adopted the apportionment upon which they had previously agreed as aforesaid, which apportionment is contained and embodied in the statement dividing the State into senatorial districts, signed by the Secretary of State and the Attorney-General, and filed in the office of the Secretary of State on April 18, 1911.

"Respondents further respectfully represent and show that the Governor never signed the said statement of the districts and took no part in the filing thereof, and never performed such official acts in regard thereto as to authorize the affixing of the Great Seal of the State thereto; and that the said statement has never been proclaimed by the Governor.

"That the numbers of the districts contained in said statement, their population and that of the several counties composing them, according to the decennial

census of the United States of 1910, and the official returns of the votes cast in the respective districts, together with the counties composing them, for the Republican and Democratic candidates for the office of judge of the Supreme Court at the general election held November 8, 1910, are as follows:

| Dist. No. | Counties. | County Popula- tion. | District Popula- tion. | 1910 Vote for Supreme Judge. Dem. | Rep. | Majority. Dem. | Rep. |
|---|---|---|---|---|---|---|---|
| 1 | Atchison | 13,604 | | 1,504 | 1,546 | ...... | 42 |
| | Gentry | 16,820 | | 2,045 | 1,735 | 310 | ...... |
| | Nodaway | 28,833 | | 3,311 | 2,958 | 353 | ...... |
| | Worth | 8,007 | | 990 | 927 | 63 | ...... |
| | | | 67,264 | 7,850 | 7,166 | 684 | ...... |
| 2 | Buchanan | 93,020 | 93,020 | 9,569 | 7,066 | 2,503 | ...... |
| 3 | Andrew | 15,582 | | 1,604 | 1,926 | ...... | 322 |
| | Clay | 20,302 | | 3,286 | 919 | 2,267 | ...... |
| | Clinton | 15,297 | | 1,909 | 1,242 | 667 | ...... |
| | DeKalb | 12,531 | | 1,590 | 1,556 | 34 | ...... |
| | Holt | 14,539 | | 1,317 | 1,836 | ...... | 519 |
| | Platte | 14,429 | | 2,317 | 698 | 1,619 | ...... |
| | | | 92,380 | 12,023 | 8,177 | 3,846 | ...... |
| 4 | Grundy | 16,744 | | 1,130 | 2,211 | ...... | 1,081 |
| | Harrison | 20,466 | | 1,600 | 2,256 | ...... | 656 |
| | Mercer | 12,335 | | 597 | 1,456 | ...... | 859 |
| | Putnam | 14,308 | | 777 | 1,697 | ...... | 920 |
| | | | 63,853 | 4,104 | 7,620 | ...... | 3,516 |
| 5 7 19 } | Jackson | 283,522 | 283,522 | 30,051 | 24,728 | 5,323 | ...... |
| 6 | Chariton | 23,503 | | 2,986 | 1,845 | 1,141 | ...... |
| | Linn | 25,253 | | 2,784 | 2,754 | 30 | ...... |
| | Livingston | 19,453 | | 2,293 | 2,263 | 30 | ...... |
| | Sullivan | 18,598 | | 2,190 | 2,277 | ...... | 87 |
| | | | 86,807 | 10,253 | 9,139 | 1,114 | ...... |
| 8 | Caldwell | 14,605 | | 1,382 | 1,939 | ...... | 557 |
| | Carroll | 23,098 | | 2,573 | 2,769 | ...... | 196 |
| | Daviess | 17,605 | | 2,184 | 2,152 | 32 | ...... |
| | Ray | 21,451 | | 2,730 | 1,337 | 1,393 | ...... |
| | | | 76,759 | 8,869 | 8,197 | 672 | ...... |
| 9 | Macon | 30,868 | | 3,414 | 2,931 | 483 | ...... |
| | Marion | 30,572 | | 3,605 | 2,045 | 1,560 | ...... |
| | Randolph | 26,182 | | 3,695 | 1,460 | 2,235 | ...... |
| | Shelby | 14,864 | | 2,176 | 868 | 1,308 | ...... |
| | | | 102,486 | 12,890 | 7,304 | 5,586 | ...... |

241 Mo.—29

State ex rel. v. Hitchcock.

| Dist. No. | Counties. | County Popula- tion. | District Popula- tion. | 1910 Vote for Supreme Judge. Dem. | Rep. | Majority. Dem. | Rep. |
|---|---|---|---|---|---|---|---|
| 10 | Adair | 22,700 | | 1,726 | 2,314 | ...... | 588 |
| | Clark | 12,811 | | 1,614 | 1,609 | 5 | ...... |
| | Knox | 12,403 | | 1,678 | 1,194 | 484 | ...... |
| | Lewis | 15,514 | | 2,173 | 1,092 | 1,081 | ...... |
| | Schuyler | 9,062 | | 1,138 | 894 | 244 | ...... |
| | Scotland | 11,869 | | 1,327 | 1,041 | 286 | ...... |
| | | | 84,359 | 9,656 | 8,144 | 1,512 | ...... |
| 11 | Lincoln | 17,033 | | 2,379 | 1,191 | 1,088 | ..... |
| | Pike | 22,556 | | 3,122 | 1,003 | 1,119 | ...... |
| | Ralls | 12,913 | | 1,892 | 705 | 1,187 | ...... |
| | St. Charles | 24,695 | | 1,956 | 3,261 | ...... | 1,305 |
| | | | 77,197 | 9,349 | 7,260 | 2,089 | ...... |
| 12 | Boone | 30,533 | | 4,876 | 1,846 | 3,030 | ...... |
| | Callaway | 24,400 | | 3,672 | 1,709 | 1,963 | ...... |
| | Cole | 21,957 | | 2,471 | 2,310 | 161 | ...... |
| | Miller | 16,717 | | 1,345 | 1,820 | ...... | 475 |
| | Osage | 14,283 | | 1,439 | 1,656 | ...... | 217 |
| | | | 107,890 | 13,803 | 9,341 | 4,462 | ...... |
| 13 | Audrain | 21,687 | | 3,267 | 1,387 | 1,880 | ...... |
| | Gasconade | 12,847 | | 508 | 2,212 | ...... | 1,704 |
| | Monroe | 18,304 | | 3,242 | 566 | 2,676 | ...... |
| | Montgomery | 15,604 | | 2,034 | 2,019 | 15 | ...... |
| | Warren | 9,123 | | 465 | 1,647 | ...... | 1,182 |
| | | | 77,565 | 9,516 | 7,831 | 1,685 | ...... |
| 14 | Camden | 11,582 | | 807 | 1,269 | ...... | 462 |
| | Cooper | 20,311 | | 2,423 | 2,462 | ...... | 39 |
| | Howard | 15,653 | | 2,596 | 953 | 1,643 | ...... |
| | Moniteau | 14,375 | | 1,651 | 1,633 | 18 | ...... |
| | Morgan | 12,863 | | 1,242 | 1,546 | ...... | 304 |
| | Saline | 29,448 | | 3,748 | 2,423 | 1,325 | ...... |
| | | | 104,232 | 12,467 | 10,286 | 2,181 | ...... |
| 15 | Johnson | 26,297 | | 3,260 | 2,504 | 756 | ...... |
| | Lafayette | 26,297 | | 3,536 | 3,414 | 122 | ...... |
| | Pettis | 33,913 | | 3,545 | 3,609 | ...... | 64 |
| | | | 90,364 | 10,341 | 9,527 | 814 | ...... |
| 16 | Bates | 25,869 | | 3,013 | 2,396 | 617 | ...... |
| | Benton | 14,881 | | 1,197 | 1,810 | ...... | 613 |
| | Cass | 22,973 | | 2,802 | 1,877 | 925 | ...... |
| | Hickory | 8,741 | | 505 | 1,114 | ...... | 609 |
| | Henry | 27,242 | | 3,367 | 2,369 | 998 | ...... |
| | | | 99,706 | 10,884 | 9,566 | 1,318 | ...... |

State ex rel. v. Hitchcock.

| Dist. No. | Counties. | County Popula- tion. | District Popula- tion. | 1910 Vote for Supreme Judge. Dem. | Rep. | Majority. Dem. | Rep. |
|---|---|---|---|---|---|---|---|
| 17 | Barton ..........16,747 | | | 1,812 | 1,537 | 275 | ...... |
| | Cedar ...........16,080 | | | 1,549 | 1,811 | ...... | 262 |
| | Dade ............15,613 | | | 1,319 | 1,741 | ...... | 422 |
| | St. Clair ........16,412 | | | 1,848 | 1,802 | 46 | ...... |
| | Vernon ..........28,827 | | | 3,282 | 1,936 | 1,346 | ...... |
| | | | 93,679 | 9,810 | 8,827 | 983 | ...... |
| 18 | Christian ........15,832 | | | 789 | 1,760 | ...... | 971 |
| | Greene ..........63,831 | | | 5,263 | 6,025 | ...... | 762 |
| | Stone ...........11,559 | | | 563 | 1,248 | ...... | 685 |
| | Taney .......... 9,134 | | | 586 | 987 | ...... | 401 |
| | | | 100,356 | 7,201 | 10,020 | ...... | 2,819 |
| 20 | Jasper ..........89,673 | | 89,673 | 7,368 | 8,299 | ...... | 931 |
| 21 | Dallas ...........13,181 | | | 838 | 1,528 | ...... | 690 |
| | Douglas .........16,664 | | | 540 | 1,562 | ...... | 1,022 |
| | Laclede .........17,363 | | | 1,616 | 1,858 | ...... | 242 |
| | Ozark ...........11,926 | | | 550 | 1,218 | ...... | 668 |
| | Polk ............21,561 | | | 1,993 | 2,367 | ...... | 374 |
| | Webster .........17,377 | | | 1,780 | 1,787 | ...... | 7 |
| | Wright ..........18,315 | | | 1,389 | 1,960 | ...... | 571 |
| | | | 116,387 | 8,706 | 12,280 | ...... | 3,574 |
| 22 | Barry ...........23,869 | | | 2,273 | 2,368 | ...... | 95 |
| | Lawrence .......26,583 | | | 2,402 | 2,848 | ...... | 446 |
| | McDonald .......13,539 | | | 1,328 | 1,284 | 44 | ...... |
| | Newton .........27,136 | | | 2,492 | 2,454 | 38 | ...... |
| | | | 91,127 | 8,495 | 8,954 | ...... | 459 |
| 23 | Butler ..........20,624 | | | 1,742 | 2,025 | ...... | 283 |
| | Carter .......... 5,504 | | | 453 | 366 | 87 | ...... |
| | Dunklin .........30,328 | | | 2,598 | 1,323 | 1,275 | ...... |
| | Ripley ..........13,099 | | | 1,125 | 829 | 296 | ...... |
| | Wayne ..........15,181 | | | 1,416 | 1,266 | 150 | ...... |
| | | | 84,736 | 7,334 | 5,809 | 1,525 | ...... |
| 24 | Dent ............13,245 | | | 1,314 | 1,129 | 185 | ...... |
| | Howell ..........21,065 | | | 1,641 | 2,058 | ...... | 417 |
| | Oregon ..........14,681 | | | 1,481 | 693 | 788 | ...... |
| | Shannon ........11,443 | | | 1,096 | 672 | 424 | ...... |
| | Texas ...........21,458 | | | 2,190 | 1,650 | 540 | ...... |
| | | | 81,892 | 7,722 | 6,202 | 1,520 | ...... |
| 25 | Cape Girardeau..27,621 | | | 2,405 | 3,258 | ...... | 853 |
| | Mississippi ......19,559 | | | 1,389 | 949 | 440 | ...... |
| | New Madrid ....19,488 | | | 1,614 | 994 | 620 | ...... |
| | Pemiscot ........19,559 | | | 1,507 | 872 | 635 | ...... |
| | Scott ...........22,372 | | | 1,630 | 1,287 | 343 | ...... |
| | | | 103,597 | 8,545 | 7,360 | 1,185 | ...... |

State ex rel. v. Hitchcock.

| Dist. No. | Counties. | County Population. | District Population. | 1910 Vote for Supreme Judge. Dem. | Rep. | Majority. Dem. | Rep. |
|---|---|---|---|---|---|---|---|
| 26 | Bollinger | 14,576 | | 1,408 | 1,540 | ...... | 132 |
| | Madison | 11,273 | | 1,081 | 1,061 | 20 | ...... |
| | Perry | 14,898 | | 1,520 | 1,758 | ...... | 238 |
| | St. Francois | 35,738 | | 2,881 | 2,919 | ...... | 38 |
| | Ste. Genevieve | 10,607 | | 1,123 | 1,095 | 28 | ...... |
| | Stoddard | 27,807 | | 2,576 | 1,851 | 725 | ...... |
| | | | 114,899 | 10,589 | 10,224 | 365 | ...... |
| 27 | Franklin | 29,830 | | 2,424 | 3,803 | ...... | 1,379 |
| | St. Louis | 82,417 | | 4,033 | 10,673 | ...... | 6,640 |
| | | | 112,247 | 6,457 | 14,476 | ...... | 8,019 |
| 28 | Crawford | 13,576 | | 1,223 | 1,582 | ...... | 359 |
| | Iron | 8,563 | | 858 | 740 | 118 | ...... |
| | Jefferson | 27,878 | | 2,654 | 2,854 | ...... | 200 |
| | Maries | 10,088 | | 1,285 | 593 | 692 | ...... |
| | Phelps | 15,796 | | 1,751 | 1,365 | 386 | ...... |
| | Pulaski | 11,438 | | 1,317 | 844 | 473 | ...... |
| | Reynolds | 9,592 | | 1,015 | 411 | 604 | ...... |
| | Washington | 13,378 | | 1,318 | 1,507 | ...... | 189 |
| | | | 110,309 | 11,421 | 9,896 | 1,525 | ...... |
| 29 30 31 32 33 34 | City of St. Louis | 687,029 | 687,029 | 54,636 | 79,375, | ...... | 24,739 |
| | Totals | 3,293,335 | 3,293,335 | 319,909 | 323,074 | ...... | ...... |
| | | | | | 319,909 | ...... | ...... |
| | Republican majority | | | | 3,165 | | |

"Respondents further respectfully represent and show that under the apportionment of the State for Senators in 1901, Jackson county was divided into two districts, numbered 5 and 7, and the city of St. Louis was divided into six districts, numbered 29-34, inclusive, and that, according to the official returns of the votes cast therein for the office of State senator at the general elections held in November, 1908, and 1910, the Fifth, Seventh, Thirty-first and Thirty-third districts elected the Democratic candidates, and the Twenty-ninth, Thirtieth, Thirty-second and Thirty-fourth districts elected the Republican candidates for the office of State senator;

"That the numbers and shapes of the districts described in the statement filed April 18, 1911, together

with the counties composing them, are correctly set forth on the following map of the State of Missouri:

Map of the State Senatorial Districts of Missouri Under
the Apportionment of April 1S, 1911.

"Respondents further respectfully represent and show that the first and only official knowledge or information which respondents had of the said statement of the senatorial districts was on or about November 1, 1911, when the Secretary of State presented to the clerk of the circuit court, city of St. Louis, a copy of said statement, and when respondents received from the Secretary of State a letter inclosing a copy of said statement, and stating that the same had been formally filed with the said clerk, that respondents, as a court, might take such action thereon as the Constitution and laws of this State require; that on November 10, 1911, respondents in general term assembled, made an order to the effect that at ten o'clock in the

morning of Friday, December 1, 1911, a meeting of the general term of the circuit court, city of St. Louis, would be held in Division No. 4, of said court, at the courthouse in the city of St. Louis for the purpose of then and there hearing the views and arguments of all persons desiring to be heard on the question of whether or not the said statement complied with the provisions of the Constitution of the State so as to require any action by respondents, a copy of which order was sent to the Governor, the Secretary of State and the Attorney-General; that on December 1, 1911, respondents as such judges of the circuit court, city of St. Louis, met in general term, in accordance with the said order, and duly heard the views and arguments of the relator and all other persons desiring to be heard, and after duly considering the same, on December 9, 1911, made an order to the effect that the circuit court, city of St. Louis, did not consider the attempted apportionment of the State for State senators contained in the statement of the districts made by the Secretary of State and Attorney-General of the State, and filed in the office of the Seretary of State on April 18, 1911, to be in conformity with the Constitution of the State, and did then refuse to subdivide the city of St. Louis into suitable districts thereunder.

"That the provisions of article 4 of the State Constitution require that the population of the State, which, according to said census is 3,293,335, should be divided by thirty-four, which is the number of senatorial districts, giving a quotient of 96,862, which is the ratio of equality of representation in the State senate, and each county of the State having a population in excess of said senatorial ratio is entitled to as many senators as the number of times which the said ratio is contained in its population, and that the apportionment contained in the said statement does not comply with the requirements of article 4 of the State Constitution, in that the city of St. Louis, having a

population of 687,029, containing the senatorial ratio seven times, with a remainder of 8995, is entitled by right under the Constitution to seven senators, and is apportioned but six senators in said statement of the districts.

"That the apportionment contained in the said statement does not comply with the requirements of article 4 of the State Constitution, in that, the difference between the population of the largest district (21) and the smallest district (4) is 52,534; in that, twenty out of thirty-four of the districts vary from the senatorial ratio over 10,000 in population, the First and Fourth varying over 25,000, the Eighth varying between 20,000 and 25,000, the Eleventh, Thirteenth, Twenty-first, Twenty-sixth, Twenty-seventh and Twenty-ninth to Thirty-fourth, inclusive, varying between 15,000 and 20,000, and the Sixth, Tenth, Twelfth, Twenty-third, Twenty-fourth and Twenty-eighth varying between 10,000, and 15,000; in that, the seventeen largest districts contain 412,229 more people than the seventeen smallest districts; in that, a large proportion of the districts are not compact in shape; in that, the districts which are least compact vary the most in population, and the districts which are the most compact vary the least in population; in that, all of the districts in Jackson county are odd numbered; in that, the said apportionment fails in many respects to comply with the requirements of the Constitution; in that, under the provisions of article 4 of the State Constitution there was vested in the Governor, Secretary of State and Attorney-General discretion to make the districts as nearly equal in population and as compact as may be, and there was imposed upon them the duty not only to observe such limitations and requirements, but also to exercise such discretion in a fair and reasonable manner without regard to party advantage, and having only in mind the purpose of securing compactness in the shape and equality in the

population of the several districts, whereas the Secretary of State and the Attorney-General in disregard of their duty, and in disregard of the provisions and limitations of the Constitution, in forming the districts, as shown by the facts aforesaid, wholly, grossly, arbitrarily, capriciously and for partisan purposes, ignored and did not consider or apply at all the said requirements of the Constitution, and did not fairly, properly and reasonably exercise the powers and duties imposed upon them.

"Wherefore, respondents respectfully represent that the apportionment contained in the statement of the senatorial districts filed in the office of the Secretary of State on April 18, 1911, has not become binding or effectual, is unconstitutional and void, and imposes ho duty upon respondents as judges of the circuit court, city of St. Louis, to subdivide the city into suitable senatorial districts thereunder.

"Wherefore, having made a full and complete return, respondents pray to be hence dismissed with their costs."

The motion for judgment is predicated upon the general allegation that the return of respondents does not state facts sufficient to constitute a defense to the alternative writ.

## OPINION.

Briefly stated the facts of this case are as follows:

On September 30, 1910, the thirteenth decennial census of the United States was promulgated, which showed that the State of Missouri, on that date, had a population of 3,293,335; that the city of St. Louis had 687,029, and that Jackson county had 283,522.

That the Forty-sixth General Assembly was duly held in the City of Jefferson in the year 1911, but it failed to apportion or redistrict the State into senatorial districts as provided for by section 7 of article 4 of the Constitution.

That under the terms of said section it then became the duty of the Governor, Secretary of State and the Attorney-General to redistrict it, as therein provided; and on April 18, 1911, they regularly convened in the City of Jefferson for that purpose and took up the matter of redistricting the State into senatorial districts.

This body, composed of the Governor, Secretary of State and the Attorney-General, whose duty it was to apportion the State into Senatorial districts, will hereafter be styled the "Miniature Legislature," for two reasons: first, for the sake of brevity; and, second, because they in fact constitute a legislative body for the purposes there mentioned.

That the districting of the State into legislative, senatorial, congressional and judicial districts is the exercise of legislative authority, cannot be successfully questioned. All of the authorities so hold, and it has been the uniform practice in this and all other states, in so far as I have been able to ascertain; that, too, has been the procedure with the United States Government. That authority is akin to, and flows from the same power and authority that fixes the boundary line of the State, and subdivides the State into counties, etc.

Not only that, but the very same section of the Constitution which authorizes and empowers the Legislature proper to apportion and redistrict the State into senatorial districts, also provides for and empowers this body of three State officials to redistrict it in case the General Assembly neglects or fails to do so.

That being true, and both deriving their authority from the same source, and performing precisely the same duties, it must stand to reason, that if the labors of the General Assembly are legislative, then the work of this body must also be legislative in character.

We call the one an act of the General Assembly, the other the statement of the Miniature Legislature.

These views also find support in the cases of State ex rel. v. Patterson, 229 Mo. 373, 1. c. 382, 383, 386, 387, 388, 391 to 396; and State ex rel. v. Roach, 230 Mo. 408, 1. c. 428, 431, 433, 434, 435, 438, 439.

In the former case, in speaking of the power of the county and circuit courts to divide their counties into representative and senatorial districts, GRAVES, J., on page 288, used this language: "Neither court can act until the Legislature acts by way of an apportionment bill. Of course, as to the senatorial districts, if the Legislature fails to apportion, the apportionment may be made by other officers mentioned in section 7 of article 4 of the Constitution, which action upon their part stands in lieu of legislative action and would authorize tht circuit court in particular counties to subdivide the counties into senatorial districts. But in either event, the circuit court must act at a time when it appears that the county is entitled to more than one senator."

And in State ex rel. v. Roach, supra, in speaking of section 7 of article 4 of the State Constitution, Fox, J., on page 428, says: "It is now the settled law of this State that the senatorial districts have been divided and their boundaries specifically defined in accordance with the provisions of the Constitution last above cited, and the people of this State fully recognized the validity of such law, and in the election of their senators conformed to its provisions."

The Governor being unable to agree to the plans of apportionment as proposed and agreed to by the Secretary of State and the Attorney-General, though being present, refused to vote for or against those plans, or otherwise participate therein, for the reasons stated in the return. Thereupon the Secretary of State and the Attorney-General agreed to the apportionment set forth in the alternative writ of mandamus. They

then filed in the office of the Secretary of State a full statement of the apportionment so made by them, duly authenticated; but the Governor refused to sign said statement, or to promulgate it as is provided for by said section 7 of the Constitution, for the reason that the apportionment or redistricting was arbitrarily and unequally done, and otherwise in violation of the Constitution of the State.

The propositions thus presented involve the construction of certain portions of sections 5, 6, 7, 9, 10 and 11 of article 4 of the Constitution, relating to the apportionment of State senators.

The material parts thereof are as follows:

"Sec. 5.   The Senate shall consist of thirty-four members, to be chosen by the qualified voters of their respective districts for four years. · For the election of senators the State shall be divided into convenient districts, as nearly equal in population as may be, the same to be ascertained by the last decennial census taken by the United States.

"Sec. 6.   When any county shall be entitled to more than one senator, the circuit court shall cause such county to be subdivided into districts of compact and contiguous territory, and of population as nearly equal as may be, corresponding in number with the senators to which such county may be entitled; and in each of these one senator, who shall be a resident of such district, shall be elected by the qualified voters thereof.

"Sec. 7.   Senators and representatives shall be chosen according to the rule of apportionment established in this Constitution, until the next decennial census by the United States shall have been taken, and the result thereof as to this State ascertained, when the apportionment shall be revised and adjusted on the basis of that census, and every ten years thereafter upon the basis of the United States census; or if such census be not taken, or is delayed, then on the basis

of a State census; such apportionment to be made at the first session of the General Assembly after each such census; Provided, that if at any time, or from any cause, the General Assembly shall fail or refuse to district the State for senators, as required in this section, it shall be the duty of the Governor, Secretary of State and Attorney-General, within thirty days after the adjournment of the General Assembly on which such duty devolved, to perform said duty, and to file in the office of the Secretary of State a full statement of the districts formed by them, including the names of the counties embraced in each district, and the numbers thereof; said statement to be signed by them, and attested by the Great Seal of the State, and upon the proclamation of the Governor, the same shall be as binding and effectual as if done by the General Assembly.

"Sec. 9. Senatorial and representative districts may be altered from time to time, as public convenience may require. When any senatorial district shall be composed of two or more counties, they shall be contiguous; such districts to be as compact as may be, and in the formation of the same no county shall be divided.

"Sec. 10. The first election of senators and representatives, under this Constitution, shall be held at the general election in the year one thousand eight hundred and seventy-six, when the whole number of representatives, and the senators from the districts having odd numbers, who shall compose the first class, shall be chosen; and in one thousand eight hundred and seventy-eight the senators from the districts having even numbers, who shall compose the second class, and so on at each succeeding general election, half the senators provided for by this Constitution shall be chosen.

"Sec. 11. Until the State shall be divided into senatorial districts, in accordance with the provisions

of this article, said districts shall be constituted and numbered as follows:'' etc.

Counsel for relator contends that when the Miniature Legislature apportioned or redistricted the State into senatorial districts in pursuance to the mandate of the constitutional provisions previously mentioned, and filed in the office of the Secretary of State a duly authenticated statement thereof, said statement became as effective as if it had been done by the Legislature itself, and that the statement so filed became an act of legislation, or statutory in character; that under said section 6 of the Constitution it is just as much the duty of the judges of the circuit court of the city of St. Louis to subdivide the city into six senatorial districts, as if the redistricting of the State had originally been made by an act of the General Assembly instead of by the statement of the Miniature Legislature; and that for all intents and purposes the statement of the latter was and is just as binding as would have been the act of the former; and that mandamus is the proper procedure to compel said judges to perform that duty.

The following among other authorities are cited and relied upon to support this contention: State ex rel. v. Higgins, 125 Mo. 364, l. c. 366-8; State ex rel. v. Patterson, 229 Mo. 364-369; State ex rel. v. Patterson, 229 Mo. 373; People ex rel. Baird v. Supervisors, 138 N. Y. 95, 115; State ex rel. v. Smith, 105 Mo. 6, 9; State ex rel. v. Field, 107 Mo. 445; State ex rel. v. Jones, 155 Mo. 576; State ex rel. v. Smith, 172 Mo. 446, 459; State ex rel. v. Broaddus, 207 Mo. 107, 121-2; State ex rel. v. Turner, 210 Mo. 77; State ex rel. v. Neville, 157 Mo. 386; State ex rel. v. McCammon, 111 Mo. App. 626; and many others.

Counsel for respondents, generally speaking, do not controvert the correctness of the legal propositions stated in the contention of counsel for the opposition, but concede the law to be, as an abstract legal proposition, as it is there stated by counsel for

relator, and cite the following additional authorities in support thereof: State ex rel. v. Roach, 230 Mo. 408, l. c. 428, 431, 433, 434, 435, 438, 439; State ex rel. v. Ziegenhein, 144 Mo. 283, l. c. 286-7; State ex rel. v. Warner, 197 Mo. 650, l. c. 655-7 and 669; State ex rel. v. Gordon, 238 Mo. 168; State ex rel. v. Messerly, 198 Mo. 351, l. c. 355-6; State ex rel. v. Nast, 209 Mo. 708, l. c. 716-8; People ex rel. v. Rice, 135 N. Y. 473; People ex rel. v. Supervisors, 147 N. Y. 1, l. c. 3, 8.

However, they further insist that the rule there announced has no application to the facts of this case, for two reasons: first, because the statement of the apportionment of the State, made by the Miniature Legislature, was never signed by, or promulgated by the Governor, as required by said section 7 of the Constitution; and, second, because even though it be conceded that it was signed and promulgated as required by law, nevertheless relator insists that, said statement possessing the character of a statute and performing the functions of such, its validity, which is denied, may be challenged in the courts of the State, for violating the Constitution.

As to the first: Section 7 of article 4 of the Constitution, in plain and unambiguous terms provides that if the General Assembly shall fail for any cause to redistrict the State into senatorial districts, as therein provided, it shall then become the duty of the Governor, Secretary of State and Attorney-General "to perform said duty, and to file in the office of the Secretary of State, a full statement of the districts formed by them, including the names of the counties embraced in each district and the numbers thereof; (a) said statement to be *signed by them,* (b) and *attested by the Great Seal* of the State, (c) and upon the *proclamation of the Governor,* the same shall be as binding and effective as if done by the General Assembly."

I have by the letters a, b, and c, called special attention to the three things which the Constitution re-

quires to be done after the apportionment has been agreed upon and reduced to writing, before the statement shall become effective; and have italicized the words thereof which in my opinion bear most vitally upon those three requirements.

By reading them, it will be seen that after the redistricting has been made by the Miniature Legislature, three things shall be done before the act or statement of the apportionment is to be "effective," namely: first, the members thereof must sign the statement; second, it must be filed and authenticated, by attaching thereto the Great Seal of the State; and, third, proclamation thereof must be by the Governor.

Conceding, which I think is correct, that a majority of the Miniature Legislature, when legally assembled for the purpose of redistricting the State, as provided for by said section of the Constituion, constitutes a quorum to transact business, then we must necessarily hold that the statement was properly and legally signed when the Secretary of State and the Attorney-General attached their signatures thereto. As to the authentication and filing of the statement, there is no question raised—all concede that the Great Seal of the State was properly affixed thereto, and that it was properly filed in the office of the Secretary of State. This leaves only one, the third requirement mentioned, to be performed, before the statement shall become as effectual as an act of the Legislature.

This is the real bone of contention involved in this branch of the case.

Practically all of the counsel for both sides concede that the statement must be promulgated before it becomes effective, but they differ widely as to what constitutes a promulgation within the meaning of the Constitution. They also contend with much force that proclamation has been made.

Others suggest that this section of the Constitution is directory only and not mandatory, and for that

reason the proclamation of the Governor is not necessary to make the statement of the apportionment binding and effectual.

We will consider the latter suggestion first.

This court is quite firmly wedded to the doctrine that constitutional requirements must be considered as mandatory rather than directory. [State v. Campbell, 210 Mo. 202; State v. Skillman, 209 Mo. 408; State v. Ulrich, 96 Mo. App. 689.] Those cases went to the extreme of holding that, section 38 of article 6 of the Constitution, the requirement that all indictments shall conclude with the words "against the peace and dignity of the State," was mandatory, and that the omission from the indictment of the word "the" before the word "State" was fatal and that the indictment was bad on that account. It must be conceded that those cases go to the very limit in holding constitutional requirements to be mandatory. In fact, they have been most severely criticised for that reason by the courts of our sister states, and by the public press of the country; nevertheless, there is much sound reason which might be advanced in their support, if we had the time or the inclination to discuss the matter here. In passing, however, I might state that the fundamental underlying such rulings is to prevent courts from tearing down by piecemeal those great bulwarks of liberty and shields of individual security, which they would not dare do openly and at one stroke.

Nor is that idea a novel one in this court. Mr. Justice Cooley, who, it is conceded by the bench and bar of the entire country, was the peer, if not the superior of any constitutional lawyer who ever graced the bench or lent honor and dignity to the bar, in his matchless work on Constitutional Limitations, pp. 93 to 98, in discussing the question, whether rules which distinguish directory and mandatory statutes apply to the provisions of a written constitution, after a careful review of the authorities, said: "It will be found,

upon full consideration, to be difficult to treat any con-
stitutional provision as merely directory and not
imperative.'' And the same eminent author, on page
72, speaking of the statutory rule which requires that
full force and effect must be given to every clause and
word of a statute, and that no word shall be treated
as meaningless if a construction can be legitimately
found which will preserve it and make it effectual,
said: ''This rule is applicable with special force to
written constitutions, on which the people will be pre-
sumed to have expressed themselves in careful and
measured terms, corresponding with the immense im-
portance of the powers delegated, leaving as little as
possible to implication.'' Many decisions are cited in
support thereof. See, also, State ex rel. v. Cunningham,
81 Wis. 440, l. c. 514, 515.

The same reason which would support argument
in favor of omitting the word ''the'' from the indict-
ment would equally support an argument justifying
the omission therefrom of the entire clause, ''against
the peace and dignity of the State,'' the difference be-
ing one of degree and not one of principle. And I might
further add, with considerable truth, that if one one-
hundredth part of the time in the future should be
devoted by prosecutors to seeing that indictments con-
form to such constituional requirements, as has been
devoted to the wholesale criticism of those cases, this
generation, at least, would never again experience the
necessity for this wild denunciation of the ''techni-
calities of the law.''

Before leaving this question, let me state to my
law-loving neighbors, that after spending the best part
of my life upon the bench, and after having observed
and read quite extensively regarding the forms and
modes of administering justice, the courts have done
far more harm and injustice by judicial legislation,
that is, by interpolating into statutes and constitutions

241 Mo.—30

words and phrases which the lawmakers never placed therein, and by striking therefrom words and phrases which were placed there by the lawmakers, than they have by clinging to the so-called technicalities.

I no more believe than you do in technicalities, but where you have so jealously guarded them, as not to even intrust them to the care and keeping of your own Legislature, which you may change every two years, but have deposited them in strong constitutional receptacles constructed by your own hands, then by what fair process of reasoning can you condemn the court, another creation of yours, for not destroying the receptacle in which you deposited your valuables? Especially when you have solemnly declared in your Constitution, that the lawmaking power of the State shall rest and abide in the Legislature and the people themselves, untrammeled, uninfluenced and uncontrolled by the courts?

Therefore, whenever you wish your so-called technicalities of the law changed or wiped from the statutes of the State, or the Constitution thereof, do you not think that it would be more wise and less harmful to you and the people generally, for you and the Legislature, which you have created for that purpose, to amend the laws and thereby correct the technicalities of which you so bitterly complain, as well as all other evils of like character, and not condemn the courts for respecting the laws which you have solemnly enacted, and which the courts have taken a solemn oath to uphold and enforce? But enough of this.

Returning to the question we had in hand before this digression. According to the rule of construction previously stated, it can scarcely be seriously contended that the clause of the Constitution which provides that upon the proclamation of the Governor the statement shall be effective, is only directory. The rule stated excludes any such idea, and it conforms to

the general idea that all forms of legislation are supposed to meet with the executive approval.

Moreover, in construing a constitutional provision, in order to arrive at its true meaning, the words thereof should be given their usual and ordinary meaning, that is, the meaning which is attached to them when used to express ideas regarding the ordinary affairs of life.

Now what is the language of the constitutional provision now under consideration? We quote: . . . "and upon the proclamation of the Governor, the same [the statement] shall be as binding and effectual as if done by the General Assembly."

This language shows a clear intention on the part of the framers of the Constitution that the taking effect of the statement was to be conditioned upon the proclamation of the Governor.

According to Webster's and the Century Dictionaries, the word "upon" is synonymous with the word "on" in all its meanings; the word "up" being almost eliminated in the definitions. Looking to the definition of the word "on" Mr. Webster defines it as follows:

"6. Upon the occasion of; following upon; used with a noun of action to express the time, often also the occasion or cause, of what is further stated."

In the Century Dictionary we find the following:

"1. As used of place or position with regard to the upper and external part of something.

"g. Noting the ground, basis, motive, method, reason or reliance of or for some action.

"3. As used of relative position:

"e. After and in consequence of; from, as a cause.

"f. At the time of; expressing occurrence of time."

In Murray's New English Dictionary we find the following:

"7. Followed by a noun of action, etc., expressing the occasion of what is stated. When."

If we use the word "upon" as we find it in the Constitution, and in the sense which these lexicographers define it, which is supposed to be the usual and ordinary meaning thereof, and since the word "upon," as thus defined, is followed by the word proclamation, a noun of action, the clear meaning of the constitutional provision, it seems to me, is, that the statement of the apportionment of the State into senatorial districts shall become binding and effectual upon the occasion of, following upon, because of, by reason of after and in consequence of the proclamation of the Governor, or at the time of the proclamation, or when proclaimed by the Governor. Or, if we transpose the language just used, the constitutional provision, as above construed, would mean that the statement of the apportionment of the State into senatorial districts shall not become binding and effectual until proclamation thereof is made by the Governor of the State.

This construction is also in harmony with the two rules of construction previously mentioned, namely: that the language of the Constitution should be so construed as to be mandatory, if it is susceptible of such a construction, and that each and every word and clause thereof should be given full force and effect, if it is possible to do so by any reasonable construction.

Looking now to the other branch of this same question, namely: (a) What is the meaning of the word proclamation, as used in this section of the Constitution? (b) Has that proclamation been made?

If I correctly understand the position of counsel for relator, it is this: That since the statement of the apportionment was duly signed by a majority of the members of the Miniature Legislature, properly authenticated by the Great Seal of the State, and found on file in the. office of the Secretary of State, there arises therefrom an indisputable presumption of law,

to the effect that proclamation thereof was properly made, and that said presumption is binding upon this court. In support of that position we are cited to the cases of Lepeyra v. United States, 17 Wall. 195 (U. S.) and Wolsey v. Chapman, 101 U. S. 770.

This calls for a somewhat critical examination of the language of the Constitution bearing upon that point.

The word proclamation, as used in this constitutional provision, must also be given its usual and ordinary meaning.

Mr. Webster defines the words as follows:

"1.   Act of proclamation: official or general notice; publication.

"2.   That which is proclaimed, publicly announced. . . .

"Law:  A public notice by an official of some order, an intended action, or some state of facts.  In British and American law the term is used only of such notices by an administrative or executive officer, or the King of Great Britain, the President of the United States, a Governor, mayor, etc., esp. with reference to some matter of public policy or the exercise of some administrative or executive power affecting the public at large; as a proclamation of material law; a Thanksgiving proclamation."

When we analyze this definition, we find that it is composed of two elements, namely: first, the officer whose duty it is to make the proclamation, and, second, the matter to be proclaimed by him.

Now as to the first:  Who is the officer designated by the Constitution to make the proclamation?  That question is answered in plain terms by the Constitution itself.  It says "upon the proclamation of the Governor," etc.  That language means the Chief Executive of the State; not the Governor, the Secretary of State and the Attorney-General, nor the two latter by themselves.  There is nothing in the language used, which

by any fair or reasonable construction can be said to include or refer to the Secretary of State or Attorney-General, severally or collectively; but if we read the language just quoted in connection with its context, it will clearly appear that it was the intention of the framers of the Constitution to exclude the Secretary of State and the Attorney-General from participating in the proclamation. The language of the contract is that all three of said officers shall apportion the State into districts, make out and sign the statement thereof, and fire it in the office of the Secretary of State, but when it comes to speak of the proclamation, it drops therefrom the words "Secretary of State" and the "Attorney-General;" and all nouns and pronouns and all other words which refer to them in any manner, but says in plain and unambiguous language that the proclamation shall be made by the Governor.

Notwithstanding these plain constitutional provisions, and notwithstanding the fact that the record shows that the Governor, from start to finish, refused to participate in the apportionment, to make up or sign the statement of the redistricting, to authenticate or assist in the filing of the statement in the office of the Secretary of State, and persistently refused and still refuses to make proclamation thereof, nevertheless, counsel for relators insist that there is a presumption of law which conclusively presumes that the Governor did make the proclamation required by said section of the Constitution.

We have carefully examined the cases cited by counsel, which it is insisted support that contention, and find that they have no application whatever to the facts of this case. The rule there announced only applies where the proclamation provided for has in fact been signed, sealed, delivered and filed in the office of the proper custodian thereof by the officer whose duty it was to make the proclamation; and in those particular cases, innocent parties had acted with the

understanding that proclamation had been made, which fact seems to have had considerable influence in aiding the court to reach the conclusions there stated. Clearly there is nothing in common between those cases and the one at bar. There the officer did every thing the act required him to do, except to make public outcry of his approval; while here the Governor concurred in nothing the other members did, but vigorously dissented from their every act, and has constantly refused to make proclamation of the statement mentioned.

We are, therefore, clearly of the opinion, that this clause of said section of the Constitution is mandatory, and that the statement of the Miniature Legislature, dividing the State into senatorial districts, is not now operative and effective, and will not become so until the Governor of the State signifies his approval thereof, by making proclamation thereof, as provided for by said constitutional provision.

II. This brings us to the consideration of the second branch of the case, as outlined in the beginning, namely: Conceding only for the sake of the argument, that the statement of the Miniature Legislature apportioning the State into senatorial districts was properly enacted and duly proclaimed, nevertheless, does it violate the constitutional provisions previously mentioned, as is insisted upon by counsel for respondents?

The great importance and the gravity of the question demands that it should be approached with due caution and considered with the highest degree of care.

By carefully reading sections 5, 6, 7, 9, 10 and 11 of article 4 of the Constitution of 1875, the material parts of which have hereinbefore been copied, it will be seen that they place certain well known restrictions and limitations upon the power and authority of both the General Assembly and the Miniature Legislature in apportioning or dividing the State into senatorial districts. Those limitations may be divided into two classes: first, those which leave to neither of said legis-

lative bodies any discretion whatever in the perform-
ance of their duties, or in the formation of the districts
aforesaid; and, second, those which leave to both of
said bodies a discretion in the performance of certain
other duties named.

(Hereafter, whatever is said about the Legislature
or the acts thereof, will refer to the Miniature Legis-
lature, for the reason that neither the Legislature
proper, nor any of its acts, are before us for review.)

The first class of duties before mentioned, namely,
those which must be performed by the Legislature
without the exercise of any discretion upon its part,
may be subdivided into three other classes, viz.:

(a)   That the Legislature shall divide the State
into thirty-four senatorial districts.

(b)   That when a district is to be composed of
two or more counties they must be contiguous. And

(c)   That in forming a district to be composed
of more than one county, no county shall be divided,
that is, one part of a county shall not be placed in one
district and the remainder placed in another.

And the second class of duties before mentioned,
namely, those which must be performed by the Legis-
lature, but in the performance of which it may exer-
cise a limited degree of discretion, may be divided into:

(a)   It shall make each district as nearly equal in
population as is practical, or as may be done.

(b)   That when a district is to be composed of
more than two counties, it shall be as compact as it
can reasonably be made so.

Preliminary to the discussion of the particular
questions presented for determination, it will not be
out of place to state generally that the authorities uni-
formly hold that the courts have jurisdiction to enter-
tain an action, pass upon the validity of acts appor-
tioning the State into senatorial districts and to declare
them invalid for infringement upon the Constitution,
or for the failure of the apportioning body to observe

the non-discretionary limitations placed by the Constitution upon their authority, in the formation of the districts. The following cases so hold: People ex rel. v. Thompson, 155 Ill. 451; People ex rel. v. Carlock, 198 Ill. 150; People ex rel. v. Rice, 135 N. Y. 473, 16 L. R. A. 836; Sherrill v. O'Brien, 188 N. Y. 185; People ex rel. v. Supervisors, 138 N. Y. 95, 20 L. R. A. 81; State ex rel. v. Cunningham, 81 Wis. 440, 15 L. R. A. 561; State ex rel. v. Cunningham, 83 Wis. 90, 17 L. R. A. 145; Giddings v. Blacker, 93 Mich. 1, 16 L. R. A. 402; Supervisors v. Blacker, 92 Mich. 638, 16 L. R. A. 432; Parker v. State ex rel., 133 Ind. 178, 18 L. R. A. 567; Denny v. State ex rel., 144 Ind. 503, 31 L. R. A. 726; Brooks v. State ex rel., 162 Ind. 568; State ex rel. Morriss v. Wrightson, 56 N. J. L. 126, 22 L. R. A. 548; Harmison v. Commissioners, 45 W. Va. 179, 42 L. R. A 591.

There is, however, some slight conflict of authority as to what extent the courts may go in reviewing the failure of the apportioning body to observe the discretionary limitations placed upon its authority to act in the premises. However, this branch of the case will receive careful consideration later, as it constitutes the principal controversy before the court.

As regards the first class of limitations mentioned, it is sufficient to state that there is no special controversy as to it, it being practically conceded by counsel that the limitations therein stated were observed and substantially complied with by the Legislature in the formation of the districts, and it will therefore be put aside. However, the limitations mentioned in the first class are so closely interwoven and intimately connected with those stated in the second, that what may be said regarding the one will necessarily apply more or less to the other.

This brings us to the consideration of the second class of duties previously mentioned, or those powers devolved by the Constitution upon the Legislature,

with a limited discretion. I use the words "limited discretion," for the reason that the Constitution in express terms limits the discretion, by providing that the Legislature shall apportion the State into districts, but in doing so it shall make each district as *nearly equal in population as may be,* and that when a district is to be composed of more than two counties, they shall be as *compact as may be convenient.*

The words italicized show conclusively that it was not the intention of the framers of the Constitution to confer upon the Legislature the unlimited power and discretion to form the districts in such shapes and dimensions as it might, in its own opinion, deem proper, nor to give to each a population which it deemed best. Had the framers of the Constitution intended that the Legislature should apportion the State into districts according to its own free and untrammeled will, then they would not have used the words of restriction before mentioned. This is too plain for argument. Therefore, having seen that the authority and discretion of the Legislature is thus limited, it would be error to treat the proposition upon the theory that the Legislature had unlimited discretion in the matter; and for that reason many of the authorities cited and relied upon have no application to this case; they dealing with officers whose discretion was unrestricted.

We will now examine the act or statement of the Legislature apportioning the State into senatorial districts, and determine therefrom whether or not that act violates the Constitution in either of the particulars stated in the second class of duties and limitations before mentioned.

We will consider them in the order there stated.

(a) Does this act, as required by the Constitution, give each of the senatorial districts a population as near equal as may be? I think not; and my reasons for so stating are these:

The United States decennial census for the year 1910 shows that the population of the State was, at the time in question, 3,293,335, and there being thirty-four senatorial districts in the State, each would have a population of 96,862, if apportioned equally among them. That was not done by the act in question, nor does the law require that the population of the State shall be apportioned equally among the various districts; but it does say that it should be so done as near as may be.

The census also shows that the population of the city of St. Louis was 687,029, and if we divide that number by 96,862, the ratio each district would be entitled to, if the population of the State should be divided equally among the thirty-four districts, it would give that city seven senators and still leave a margin of 8995 persons unrepresented; nevertheless, the act allowed only six districts to said city, leaving 105,857 persons unrepresented.

Counsel for respondents insist that this part of the act of the apportionment is clearly violative of the Constitution, and is therefore null and void.

This is a most flagrant violation of the limited discretion granted by the Constitution to the Legislature; and if the law will permit, we will have to hold it to be null and void. We will consider the legal question later.

' Again, the census gives Jackson county a population of 283,522, and if we divide that number by 96,862, the ratio before mentioned, it would give to that county two senators with a surplus population of 89,798. Counsel for respondents insist that this provision of the apportionment act is also unconstitutional, null and void for the reason that it gives to Jackson county three districts, when in fact, according to the senatorial ratio, it is only entitled to two.

Literally speaking that is true; but counsel overlook that provision of the Constitution which prohibits the Legislature, when forming a district to be com-

posed of more than one county, from dividing a county, and placing a part of it in one district and the remainder in another. And under that rule, if the act had given Jackson county only two districts, then there would have been a surplus population of 89,798, unrepresented in that county (which could not have been placed in another district composed of other counties), which would have been almost as flagrant a violation of discretion as was exercised by the Legislature in the St. Louis apportionment before mentioned.

If we were right in holding that the act of apportioning the city of St. Louis into six districts, was void, then by parity of reasoning we must, under the facts and circumstances, hold that the act apportioning Jackson county into three districts was valid.

It is also shown by the census that the Twenty-first district has a population of 116,387, while the Fourth has a population of only 63,853, a difference of 52,534; that twenty out of thirty-four of the districts vary from the senatorial ratio over 10,000 in population, the First and Fourth varying over 25,000, the Eighth varying between 20,000 and 25,000, the Eleventh, Thirteenth, Twenty-first, Twenty-sixth, Twenty-seventh and Twenty-ninth to Thirty-fourth, inclusive, varying between 15,000 and 20,000, and the Sixth, Tenth, Twelfth, Twenty-third, Twenty-fourth and Twenty-eighth varying between 10,000 and 15,000; in that, the seventeen largest districts contain 412,229 more people than the seventeen smallest districts.

As an independent proposition, it cannot be fairly insisted that the act making this apportionment gives to each of these districts a population that is as near equal in numbers as it was possible to make it; and were it not for the fact that the Constitution also requires that the districts shall be made as compact and contiguous as it could reasonably be done, without a division of counties, I dare say, no one would for a moment attempt to justify such action.

But if that apportionment is to be justified upon the ground that the equality of population had to be sacrificed for the preservation of the county unit and the compactness of the territory forming the districts, then the apportionment must fall, for the reason that, in my opinion, the act more obviously violates that provision of the Constitution which requires the districts to be compact, than it does the one requiring equality of population.

In confirmation of this statement, I here set out maps of the Third, Thirteenth, Fourteenth, Sixteenth, Twenty-first, Twenty-fifth, Twenty-sixth and Twenty-eighth districts, which are as follows:

Map of the 3rd, 13th, 14th, and 16th State Senatorial Districts of Missouri under the Apportionment of April, 18, 1911.

Map of the 21st, 25th, 26th, and 28th State Senatorial Districts of Missouri under the Apportionment of April, 18, 1911.

Counsel for respondents also contend, ''that the apportionment shows that considered together the limitations as to compactness of territory and equality in population have not been observed to such an extent as to constitute a gross abuse of discretion. A reasonable construction of the limitations as to compactness of territory and equality in population would seem to require that if predominance is to be given to either, it should be given to the latter because equality in representation has always been one of the ideals in American government. This predominance, however, must be slight because subject to the limitation that the districts must also be compact. It therefore follows that any departure from the limitation of equality in population must be made for the sake of securing greater compactness, and any departure from the limitation of compactness must be made for the purpose of securing greater equality in population, so that it is evidence of abuse of discretion for a district not compact in shape not to approach the senatorial ratio of population to a reasonable extent. In other words it is to be expected that compact districts shall show a greater variation from the senatorial ratio than districts which are not compact, so that if districts not compact show a less reasonable approximation to the senatorial ratio than those which are compact, there would be evidence of a gross abuse of discretion.''

In regard to this construction, we will state that the following table will show the difference between the senatorial ratio, 96,862, and the population of the twelve most compact districts, and the eleven least compact; no district lying wholly in one county is included.

## Table of Variations in Population.

### (Ratio 96,862.)

| COMPACT DISTRICTS. | | | NON-COMPACT DISTRICTS. | | |
|---|---|---|---|---|---|
| No. | Pop. | Diff. | No. | Pop. | Diff. |
| 1 | 67,264 | -29,598 | 4 | 63,853 | -33,009 |
| 27 | 112,247 | 15,385 | 8 | 76,759 | 20,103 |
| 24 | 81,892 | -14,970 | 11 | 77,197 | -19,665 |
| 10 | 84,359 | -12,503 | 21 | 116,387 | 19,525 |
| 23 | 84,736 | -12,126 | 13 | 77,565 | -19,297 |
| 12 | 107,890 | 11,028 | 26 | 114,899 | 18,037 |
| 6 | 86,807 | - 9,055 | 28 | 110,309 | 13,447 |
| 15 | 90,364 | - 6,498 | 14 | 104,232 | 7,370 |
| 22 | 91,127 | - 5,735 | 25 | 103,597 | 6,735 |
| 9 | 102,486 | 5,624 | 3 | 92,380 | 4,482 |
| 18 | 100,356 | 3,494 | 16 | 99,706 | 2,844 |
| 17 | 93,679 | - 3,183 | | | |

| | | | | | |
|---|---|---|---|---|---|
| 12 | Total variation 129,199 | | 11 | Total variation | 164,514 |
| | | | | Compact " | 129,199 |
| | | | | Difference | 35,315 |

This table, which is absolutely correct, shows that collectively the greatest variances in population are in the districts which are the least · compact, or in other words, it shows that compactness was not sacrificed in order to obtain equality in population, nor *vice versa.*

This analysis of the facts of the case is most conclusive. evidence that the Legislature in apportioning the State into districts wholly disregarded the constitutional mandates as to compactness of territory and equality in population.

We will now consider the law applicable to the facts of the case.

At a previous place, we had occasion to state that the authorities were uniform in holding that the courts have jurisdiction to pass upon the invalidity of acts of the Legislature apportioning a State into representative and senatorial districts for failure to obey the limitations which prohibit the exercise of all discretion on the part of the lawmakers; also that they were practically uniform in holding that. the courts

have jurisdiction to pass upon the validity of appor-
tionment acts, and to hold such acts unconstitutional
and void, for failure on the part of the Legislature
to properly observe the limitations which permit the
exercise of limited discretion in that regard.

This slight conflict of authority, as to the extent
to which the courts may go in reviewing the exercise
of discretion within the meaning of the limitations
stated in the second class of duties, before mentioned,
is no more than should be expected. This is largely
due to the fact that there are no absolute limits fixed
by the Constitution within which the discretion must
be exercised, and the courts are disinclined to inter-
fere where they find any discretion has been exercised
by the Legislature, even though the exercise of that
discretion has exceeded the general bounds limiting
its discretion. It is also due to the fact that the courts
have been loath to inquire into the motives that prompt
the Legislature in such matters, preferring naturally
to leave the responsibilities of a co-ordinate branch
of the government to the people who elected it. Con-
fusion has also arisen from the fact that the courts
have not always drawn the proper distinction between
sovereign legislative bodies, created by the Constitu-
tion itself, and those *quasi*-legislative and judicial
bodies created by statute, or appointment by some
authorized officer of the State. And in this connec-
tion, we wish to state that those decisions of courts
controlling the discretion of such minor bodies have
no application to the facts of this case. Here the
Constitution created the Miniature Legislature for
the express purpose to apportion the State into sena-
torial districts, and for that purpose the Constitution
gives to it the same power and authority that it gave
to the Legislature proper, in that regard, and for
that reason both of them must and do stand upon an
equal footing before the law, and in the presence of
the courts.

We will, therefore, put aside that great array of authorities cited by counsel for relator, which apply to those *quasi*-legislative and judicial bodies; and will only consider those authorities which deal with sovereign legislative bodies.

The latter may be divided into three classes: (a) those which hold that the courts will not declare an apportionment act invalid unless it plainly appears therefrom that the limitations placed upon the discretion of the Legislature have been wholly ignored, and not applied at all in creating the districts; (b) others of them hold that courts will interfere whenever the act shows that the discretion has been grossly abused; and (c) those which hold that the court will not interfere except where the act shows that the discretion has been abused to such an extent as to show the Legislature entirely disregarded the limitations enjoined upon it by the Constitution. But practically all of them unite in holding that it would be quite difficult to lay down a general rule applicable to all cases, but each case that arises must stand largely upon the facts thereof, and the character and extent of the limitations imposed upon the discretion of the Legislature by the Constitution.

In the case of State ex rel. v. Cunningham, 83 Wis. 90, the senatorial ratio was 51,117; the Legislature in apportioning the districts varied the population thereof from 30,700 to 65,900. In that case, the Supreme Court held that the act of apportionment was unconstitutional, null and void, for the reason that it showed upon its face that the Legislature plainly disregarded the constitutional limitations placed upon its discretion in establishing the districts.

In Giddings v. Blacker, 93 Mich. 1, the senatorial ratio was 65,000. The act of apportionment varied the population of the districts from 39,727, to 97,330, and eight senators represented 695,717 people, and eight others represented only 349,156, and the county

of Saginaw, with a population of 82,273, was given two senators. The Supreme Court held the act unconstitutional, because it showed upon its face that the Legislature wholly disregarded the constitutional limitations placed upon it. The court in that case took occasion to criticize in unmeasured terms the practice of gerrymandering, and said that it was time that a stop should be put to it. The language of the court upon that point is as follows:

"While it is true that the motive of an act need not be inquired into to test its constitutionality, I believe that the time for plain speaking has arrived in relation to the outrageous practice of gerrymandering, which has become so common and has so long been indulged in without rebuke, that it threatens not only the peace of the people, but the permanency of our free institutions. The courts alone, in this respect, can save the rights of the people, and give to them a fair count and equality in representation. It has been demonstrated that the people themselves cannot right this wrong. They may change the political majority in the Legislature, as they have often done, but the new majority proceeds at once to make an apportionment in the interest of its party, as unequal and politically vicious as the one that it repeals. There is not an intelligent schoolboy but knows what is the motive of these legislative apportionments, and it is idle for the courts to excuse the action upon other grounds, or to keep silent as to the real reason, which is nothing more nor less than a partisan advantage taken in defiance of the Constitution, and in utter disregard of the rights of the citizen."

In People ex rel. v. Rice, 135 N. Y. 473, the act of apportionment gave to one county, with a smaller population, twice as many representatives as it gave to another of greater population; nevertheless, the court held the act valid. In discussing that case the

court in speaking through PECKHAM, J., on pages 498, 501 and 509-510, said:

"From the formation of government under written constitutions in this country the question of the basis of representation in the legislative branch of the government has been one of the most important and most frequently debated. It is not true that equality of numbers in representation has been the leading idea at all times in regard to republican institutions. Political divisions of the State have in New England been the bodies which were entitled to representation, and the town as a town and irrespective of the number of inhabitants has had its representative in the Legislature, so that a large town necessarily had no more representation than a much smaller one. This is the case to-day in some of the New England States.

"The power to readjust the political divisions of a sovereignty with the view of representation of those divisions or of the inhabitants thereof, in the Legislature, resides of course in the first instance with the people, who in this country are the source of all political power. The essential nature of the power itself is not, however, altered by that fact. In its nature it is political as distinguished from legislative or judicial. In intrusting such power to any particular body, the people could by their Constitution give written instructions as to how it should be carried out, yet the essential nature of the power still remains. If a portion of it be intrusted to a body of men acting as a board for the mere purpose of making a mathematical calculation and with instructions to discharge its duties in a way which is solely mathematical, it is clear that the board has no discretion whatever and it is bound strictly by the terms of the grant of power. In such case the people have not in reality parted with the whole power. There may then be a power in the court to correct the very slightest

deviation.from what can be clearly seen to be a mere ministerial duty. There being no possibility for the exercise of the slightest discretion, a violation of the arithmetical rule of proportion would become a violation of the Constitution and as such might be the subject of review by the courts. The power to review would exist because of the fact that the people had so bound and limited the exercise of the power to readjust the political divisions of the State that the power itself thus limited, had become in its exercise by the body to which it was intrusted, one of a ministerial nature only. Its nature as a political power in the board itself would in such case have been changed by the refusal of the people to permit of its exercise upon any other than a mathematical basis. Hence a direction to a body created by the people for such a purpose, which permitted no discretion in its exercise under any circumstances, might properly form the subject of enforcement by the courts. This, however, is not the case under our constitution. The power to alter these political divisions has been deposited by the people with the Legislature and under such circumstances as to compel the exercise of legislative discretion in carrying out the power granted. The political nature of the power is thus retained. The learned judge who delivered the opinion at special term in the Pond case himself admits that some discretion is vested in the Legislature and that in the nature of things it must be so left. He was of the opinion that the discretion thus vested in the Legislature had been overstepped and that the Constitution had been thereby violated, and that the courts could review and reverse this action of the Legislature.''

Discretion is necessarily reposed in the Legislature because of the direction of the Constitution that in making up the senatorial districts they must at all times consist of contiguous territory, and that no county shall be divided in the formation of a district, ex

cept such county shall be equitably entitled to two or more senators. It is also provided that in apportioning members of Assembly every county shall be entitled to one member.

"This renders the mathematical process impossible both as regards senate districts and the apportionment of members of Assembly. We start then with the proposition that to the Legislature is entrusted some discretion in the matter of apportionment. Is the court to interfere with such power whenever it thinks that the Legislature might in its exercise possibly have come nearer to an equality, after complying with the special conditions mentioned in the Constitution? This would be to assert a power in the court to supervise the use of the discretion granted to the Legislature, if such discretion were exercised in the slightest degree after the constitutional mandate in regard to county lines and county members had been complied with. We do not believe in the propriety or necessity of any such rule. On the contrary, we think that the courts have no power in such case to review the exercise of a discretion entrusted to the Legislature by the Constitution, unless it is plainly and grossly abused. The expression 'as nearly as may be,' when used in the Constitution with reference to this subject, does not mean as nearly as a mathematical process can be followed. It is a direction addressed to the Legislature in the way of a general statement of the principles upon which the apportionment shall be made. The legislative purpose should be to make a district of an equal number of inhabitants as nearly as may be, and how far that may be carried out in actual practice must depend generally upon the integrity of the Legislature. We do not intimate that in no case could the action of the Legislature be reviewed by the courts. Cases may easily be imagined where the action of that body would be so gross a violation of the Constitution that it could be seen that it had been en-

tirely lost sight of and an intentional disregard of its commands both in the letter and the spirit had been indulged in.

"Upon the argument our attention was called to certain cases decided in Michigan and Wisconsin, involving to some extent the question decided therein.

"In some of them the violation of the spirit of the Constitution was gross beyond cavil or argument. They would come within the description of an abuse of legislative discretion. In others the positive commands of the Constitution as to counties were plainly violated. The actual decisions might perhaps be upheld on the lines laid down in this opinion, but there are some things stated in some of the opinions which go beyond what this court is prepared to concur in.

"The discretion necessarily vested in the Legislature must be finally disposed of by it, unless, as we have said, there is such an abuse of that discretion as to clearly show an open and intended violation of the letter and spirit of the Constitution."

And in Baird v. Supervisors, 138 N. Y. 95, 112-114, the Board of Supervisors had made a division under which the districts varied in population from 31,000 to 102,000, and in holding the apportionment invalid, PECKHAM, J., says:

"Assuming that we have reached a correct conclusion as to the duty of the board to divide the county into assembly districts in the manner just stated, the true meaning of the section still remains somewhat of a problem. It is very plain that a division simply by an arithmetical process is not contemplated, because the injunction to refrain from dividing a town would in many cases render such a process wholly impracticable. The further injunction, to make the districts of convenient and contiguous territory, might render it still more impracticable to divide with relation merely to inhabitancy. The main duty which is imposed upon the board is to make the division equal as

to population, so far as that is attainable, while making each district of convenient and contiguous territory and keeping the town undivided. Perfect equality of population cannot, under these conditions, be attained. The proper discharge of the duty of division by the board implies considerable discretion in the formation of the various districts. The discretion exercised must be an honest and a fair discretion, arising out of the circumstances of the case, and reasonably affecting the exercise of the power of equal division. Before examining any division, it would be a prima facie presumption that the division actually made in any case was a proper one, and a full compliance with the duty imposed upon the board which made it. This would be in accordance with the presumption in favor of the due and proper discharge of official duty. Nor would the mere fact that the districts were to some extent unequal in population necessarily rebut this presumption. The necessity of considering the other facts provided for by the section, and already alluded to, might reasonably account for many, and even somewhat large, aberrations from the initial point of equal representation. While it is impossible, in the nature of the case, to accurately describe and closely limit the amount of deviation from an equal representation that the practical working of the Constitution may in this respect permit, it is, on the other hand, sometimes quite possible to say of a particular example that it does or does not violate the constitutional mandate.

"We have no trouble whatever in detecting the difference between noon and midnight, but the exact line of separation between the dusk of the evening and the darkness of advancing night is not so easily drawn.

"A question of somewhat similar nature was before us in People ex rel. v. Rice, cited supra. The question there related to the amount of discretion reposed in the Legislature in the creation of senate dis-

tricts, and in the apportioning of members of the Assembly among the several counties.    It was there stated that it was not intended to intimate by the decision  then made that in no case could the action of the Legislature be reviewed by the courts, and that cases might easily be imagined where the action of the Legislature would be so gross a violation of the Constitution that it was plain that instrument had been entirely lost sight of, or intentional disregard of its commands, both in the letter and in the spirit, had been indulged in.  If there were an abuse of the discretion so as to clearly show an open and intended violation of the Constitution, we held in that case that the courts might interfere.  We did hold that the facts as presented contained no such features, and, although there was no mathematical division, the court refused to interfere with the discretion that had actually been exercised by the Legislature.

"We think, in the case of assembly districts, the duty is at least as plain which governs the board of supervisors as that which rests upon the Legislature in the case mentioned.  It is not every departure from equality in the number of inhabitants that can be interfered with, or that ought to be the subject of review, by the courts.

"If the division with reference to the facts of convenience and contiguity of territory, the indivisibility of the town, and the number of inhabitants in the various districts, as compared with each other, do not lead most inevitably to the belief that the board has intentionally disregarded the constitutional provision, we think, in such case, its action should be upheld.

"We do not intend by this decision to hold that every trifling deviation from equality of population would justify or warrant an application to a court for redress.  Such, we think, is not the meaning of the provision.  It must be a grave, palpable and unreasonable deviation from the standard, so that, when the

facts are presented, argument would not be necessary
to convince a fair man that very great and wholly
unnecessary inequality had been intentionally pro-
vided for. This is as near an exact definition of the
meaning of this section in this regard as I am able to
now give.''

In People ex rel. v. Thompson, 155 Ill. 451, 461-2,
462-4, 465, 469-70, 480-3, 484-5, with a senatorial ratio
of 75,000, the districts varied in population from
62,000 to 88,000. In holding these discrepancies in-
sufficient to invalidate the act, but in approving the
rule announced in Michigan and Wisconsin cases, su-
pra, the court said:

''It would be a legal anomaly if the Legislature
could enact a statute in clear conflict with the express
limitations fixed by the Constitution, in a matter of
vital importance to all the people of the State, and the
courts have no jurisdiction to pass upon the validity
of such statute when directly involved in a pending
case. It is not meant to be here said that the act or
acts in question is or are in clear conflict with the
limitations expressly fixed by the Constitution, but
only that the courts have jurisdiction to determine
whether it is so or not, and if such conflict be found
to exist, to declare such act or acts void, and that
this jurisdiction is not affected, when the question is
properly raised in a suit at law, by the fact that only
political rights of the parties are involved, nor by the
contention that the statute in question is the mere
product of the exercise of that political power resid-
ing in the Legislature, wherein its decision is final. It
is undoubtedly true that, so far as the act in question
is the expression of the unabridged discretion re-
posed in the Legislature, its decision must be final
and not subject to review by the courts; but the courts
have jurisdiction to interpret and construe the Consti-
tution and the statute in order to determine whether
the act is within the legislative discretion or not.

"That part of section 6 of article 4 of the Constitution which appellants insist has been violated by the Act of 1893, is as follows: 'The General Assembly shall apportion the State every ten years, beginning with the year 1871, by dividing the population of the State, as ascertained by the Federal census, by the number fifty-one, and the quotient shall be the ratio of representation in the senate. The State shall be divided into fifty-one senatorial districts, each of which shall elect one senator, whose term of office shall be four years. . . . Senatorial districts shall be formed of contiguous and compact territory, bounded by county lines, and contain, as nearly as practicable, an equal number of inhabitants, but no district shall contain less than four-fifths of a senatorial ratio. Counties containing not less than the ratio and three-fourths may be divided into separate districts, and shall be entitled to two senators, and to one additional senator for each number of inhabitants equal to the ratio contained by such counties in excess of twice the number of said ratio.' The section providing for minority representation in the house of representatives, adopted by the people in lieu of sections 7 and 8, which formed a part of the draft of the Constitution as submitted to the people, provides that three representatives shall be elected from each senatorial district. There is no difference, in our State, between the senatorial and representative districts, as in many of the States of the Union, but the territory of both is the same.

"It will be noticed that in the formation of senatorial districts, there are certain limits to the power of the General Assembly, prescribed by the Constitution in such definite terms as to be readily recognized and understood by every one, without room for difference of opinion. These limitations may be stated as follows:

"First. All districts, except those formed within

counties having sufficient population to be divided into separate districts, must be bounded by county lines.

"Second. A county cannot be divided into separate districts unless it contains at least one ratio and three-fourths; when it may be divided, and be entitled to two senators, and to one additional senator for every ratio in excess of two full ratios.

"Third. No district shall contain less than four-fifths of the ratio.

"Fourth. Districts shall be formed of contiguous territory.

"It would seem incontrovertible that as to these four restrictions, by which the power of the General Assembly is definitely limited, no room is left for difference of opinion, in reasonable minds, as to their meaning, nor for the exercise of any legislative discretion except within the bounds of these limitations, it being clear that they must all be observed in any sense which can be imputed to them, in the enactment of any valid apportionment statute.

"Nor is it claimed that in the Act of 1893, or in the Act of 1882, the Legislature disregarded any of them. But there are other requirements contained in the section of the Constitution above quoted, respecting the apportionment of the State, which, as qualified and made subject to the definitely expressed limitations above mentioned, are not so definite in meaning or easy of determination as to preclude differences of opinion in reasonable minds, or as to fall so clearly without the bonds of legislative discretion. These are: that districts must be formed of compact territory, and contain, as nearly as practicable, an equal number of inhabitants. And it is in respect to these provisions that the present controversy arises. The only definite rule which can be deduced from these two requirements of the Constitution, when controlled, as they must be, by those more definitely defined (and as to whether it should be applied or not in making

an apportionment all reasonable minds would agree, and the Legislature could have no discretion), may, we think, be stated as follows:

"Fifth. In making an apportionment of the State, under the Constitution, the Legislature must have in view, and apply, the principles of compactness of territory and approximate equality in population in the formation of senatorial districts.

"In applying these rules prescribed by the Constitution itself and by which the constitutionality of the statutes in question must be tested, it must be borne in mind that where there is any reasonable doubt as to whether a statute is constitutional or not, the courts will incline in favor of the law, and hold it valid.

"Keeping this rule of construction in mind, and having stated the rules prescribed by the Constitution which are limitations on the power of the General Assembly in making a senatorial apportionment, and which cannot be violated by that body in enacting any valid apportionment act, we will review, as briefly as we may, the questions involved, to ascertain whether or not the Legislature has overstepped these constitutional limits in passing the statute in question.

"The only county in the State having as many inhabitants as a ratio and three-quarters, at the time of the passage of either of the Acts of 1882 or 1893, was the county of Cook, and it was therefore the only county that was, or could be, divided. The intention is plainly manifest in the Constitution to preserve the integrity of the several counties in the formation of senatorial districts, except where a county has sufficient population to make it necessary to divide it into separate districts. The county being the most important political division of the State, its autonomy is expressly guarded by the Constitution in the formation of these legislative districts, and in importance it is placed above the requirements of compactness of ter-

ritory and equality in population. It might be a far less difficult matter to divide the State into fifty-one senatorial districts, formed of contiguous and compact territory and each having substantially the same number of inhabitants, if no regard were paid to county. lines. But it cannot be doubted that such an apportionment would be plainly unconstitutional, notwithstanding it would secure a compactness of territory and equality in population in the several districts not otherwise attainable. As every district outside of Cook county must, under the Constitution, have been bounded by .county lines, it is apparent that it was impossible to combine these counties, differing so radically in shape, size and population, so that there would be anything more than a reasonable approximation toward equality in population and perfect compactness of territory.

"The really difficult question in the case is to determine the bounds fixed by the Constitution to the discretion of the General Assembly, when that body, acting within other and more definitely expressed limitations, is complying with the constitutional mandate to form senatorial districts of compact territory, containing, as nearly as practicable, an equal number of inhabitants. If the statute is within those bounds, though resulting in inequality and injustice, it is valid, for the courts have no power to revise or annul an act of the Legislature which is the mere exercise of its discretionary power, or which rests in the legislative judgment.

"Many other instances might be cited, were it necessary, where the decision of the other departments of the State government are not subject to reversal by the courts. Full power and final authority to perform the different governmental functions must be lodged somewhere, and it is the duty of all public functionaries to respect the disposition of the several powers of government as made by the Constitution.

It would be a new doctrine and one fraught with much danger, to hold that the courts may reverse or annul acts of the other departments in matters committed by the Constitution to the judgment and determination of such other departments, or in matters where it is a question of serious doubt whether they are so committed or not, even though the courts might be satisfied that in the determination of the question by the department to which it is committed, the Constitution has not been properly observed. The only remedy for dereliction of duty in such cases lies in the frequency of elections, by which the people may choose others to serve them, and in the impeachment and removal from office of those made subject to that punishment. This view does not deny the jurisdiction of the court to pass upon the constitutionality of a statute making a senatorial apportionment to the same extent as in other cases, but it does deny the power of the court to follow the statute any further than the boundary line enclosing the discretionary power of the Legislature, and to invade that discretion in any case.

"It was not discretionary with the Legislature whether it would, or not, comply with the four restrictions before mentioned, upon its power, respecting the observance of county lines, the division of counties, the minimum number of inhabitants necessary to form a district, and the contiguity of territory in forming districts. Nor was it discretionary as to whether or not that body would, subject to said limitations, apply the principles of compactness of territory and approximate equality in population in making the apportionment; but we do hold that it was a question for its final determination as to what approximation could or should be made toward perfect compactness of territory and equality in population, . . . and this, too, though treating this requirement of the Constitution as mandatory on the Legislature. In other words, if it clearly appeared that in the forma-

tion of any district, the requirement of compactness of territory and equality in population had been wholly ignored, had not been considered or applied at all, to any extent, then the statute would be clearly unconstitutional. But if it has been considered and applied, though to a limited extent only, subject to the other more definitely expressed limitations, then the General Assembly has not transcended its power, although it may have very imperfectly performed its duty, and the act is valid.

"The word 'compact' has different meanings, as given by standard lexicographers, according to the subject in connection with which it is used.  .  .  . Counsel for appellants contend that, so far as it can be applied to mere territorial surface, it means 'dense' —'pressed together'; and the say: the districts are to be so formed that the territory shall be 'pressed together'—close—near to a common center; in no way so well expressed as by the word 'compact.' Not much fault can be found with this contention, but we are of the opinion that as used in the Constitution, and applicable to mere territorial surface, the word 'compact' means 'closely united,' and that the provision that districts shall be formed of contiguous and compact territory means that the counties or subdivisions of counties (when counties may be divided) when combined to form a district, must not only touch each other, but must be closely united territorially: The requirement of contiguousness was contained in the Constitution of 1848, and it was evidently the intention of the people, in adding the requirement of compactness in the Constitution of 1870, to guard, as far as practicable, under the system of representation adopted, against a legislative evil, commonly known as the 'gerrymander,' and to require the Legislature to form districts, not only of contiguous, but of compact or closely united, territory.

241 Mo. 32.

"The provision requiring compactness of territory, subject, as it must be, to other more definitely expressed rules, may also, in application, be modified by the requirement of equality in population. It was said by the Supreme Court of Wisconsin in a recent case (State v. Cunningham, 83 Wis. 151), that 'compactness, being of less importance, may to some extent yield in aid of securing a nearer approach to equality of representation.' While it is not necessary, if within our province, to determine which of these two requirements should yield to the other, yet it is plain that in application each must to some extent affect the other. Who, then, must finally determine whether or not a district is as compact as it could or should have been made? Surely not the courts, for this would take from the Legislature all discretion in the matter and vest it in the courts, where it does not belong; and no apportionment could stand unless the districts should prove as compact as the judges might think they ought to be, or as they could themselves make them. As the courts cannot make a senatorial apportionment directly, neither can they do so indirectly. There is a vast difference between determining whether the principle of compactness of territory has been applied at all or not, and whether or not the nearest practical approximation to perfect compactness has been attained. The first is a question which the courts may finally determine; the latter is for the Legislature.

"Some room, it must, in reason, be admitted, is left by the Constitution for the exercise of the legislative judgment in determining how near an approximation to perfect compactness of territory and equality in population can be made, and it must also be admitted that the scope within which the judgment of the Legislature may be exercised without being subject to the supervision of the courts must be determined by the language of the Constitution, and the ap-

plication of sound legal principles, and not by the mere arbitrary opinion of judges. Would it not be mere arbitrary opinion for this court to say that the statute is void because, although no district as formed contains less than three-fourths of the ratio, but several thousand more, yet some districts should have contained still more and others less to more nearly approximate equality? How many more, or how many less? Or because some districts might have been made more compact? How much more? Who shall draw the definite line across this legislative field, where none is drawn by the Constitution? And where shall it be drawn? How can the courts lay down any rule founded on legal principles and not on mere arbitrary opinion by which it can be determined how near above the minimum of four-fifths the Legislature must approach the ratio of 75,026 to make the apportionment valid? The rule of mathematical approximation requiring the nearest approach to equality mathematically possible, could not, of course, be applied, and at the same time the other constitutional requirements be ·obeyed, as before pointed out. Such a rule might possibly be adopted where, as in some of the States, each county is allowed one member of the Assembly, and the surplus of members is apportioned to the counties having the largest fractions of representative population. But that is not the method contemplated by the Constitution of this State.

"The apportionment, as made by the Act of 1893, does not make the districts vary as much in population as from a fifth below to a fifth above the ratio. Here is a wide latitude, in a populous State, for inequality, it must be admitted; and we do not mean to say that the Legislature could have arbitrarily formed a district containing simply the constitutional minimum of four-fifths, and another district adjoined with one-fifth or more above the ratio, when by taking a county from the larger and adding it to the

smaller district, greater equality in population and compactness of territory could have been secured, for in such case, it might perhaps be said that the principles of compactness of territory and approximate equality in population, above the minimum, had been disregarded and not applied at all by the Legislature. But no opinion is expressed as to whether such an apportionment would be valid or not, for by the statute in question, the lowest number of inhabitants in any district is, in round numbers, 62,000, which is an approach toward the ratio (75,026, the standard of equality) of 2,000 above the minumum of four-fifths of the ratio. It is therefore seen that the Legislature did have in view, and did apply, to some extent, the principle of approximate equality in population, above the minimum fixed by the Constitution, not the nearest approximation, it is true; and it might well have been contended in the legislative body itself, having the power to determine the question, that justice and equality in representation, as contemplated by the Constitution, required a much closer approximation.

"It follows, also, that it cannot be said that the Legislature wholly failed to have in view and apply the principle of compactness of territory. No district, unless a circle or a square, could be so compact that it could not be made more so. Nor can it be said, we think, that this construction gives to the phrase 'contiguous and compact territory,' as used in the Constitution of 1870, no more force than the phrase 'contiguous territory' as used in the Constitution of 1848. The territory forming the districts under the Act of 1893 is not contiguous, merely, but is, to some degree, compact. Doubtless a district could be formed of counties so 'strung out' and barely touching, as to make the territory contiguous but not compact in any sense, but we cannot see that such a district has been formed.

"It would seem plain that in the instances men-

tioned in the Wisconsin and Michigan cases there was no approximation toward equality in representation, for where one district contained in the one case more than twice, and in the other nearly three times, the population of another district, the Legislature could not at all, in those instances at least, have regarded the injunction of the Constitution to make the apportionment 'according to the number of inhabitants.' "

The act of apportionment giving the city of St. Louis only six districts, instead of seven, as we have heretofore shown she was entitled to, clearly indicates that the Legislature ignored the mandate of the Constitution requiring all districts to be as near equal in population as they could be made.

This failure of the act to give the city of St. Louis seven senators, constitutes such an abuse of discretion on the part of the Legislature as to render the entire apportionment invalid. If the city of St. Louis is to be given seven districts instead of six, as she must, then the remaining portion of the State will have to be apportioned into one district less than it now has under this apportionment, which of course will necessitate a substantial change in all the other districts of the State, those of Jackson county, probably, excepted.

This one defect is sufficient to invalidate the entire act of apportionment; but we are not called upon to rest this opinion upon a single defect, for the record discloses the fact that the Legislature, as previously pointed out, grossly abused its discretion in the same manner as to several other districts, especially regarding the variation between the population of the largest and the smallest districts; also in failing to observe the constitutional requirements regarding the compactness of the districts.

In the case of State ex rel. v. Cunningham, supra, the Supreme Court of Wisconsin, on pages 528-529, in discussing this question said:

"2. Chapter 482, Laws 1891, violates another constitutional requirement. Section 3, article 4, ordains that apportionments of legislative districts shall be made 'according to population,' excluding therefrom certain classes of persons therein specified. Because the county is the primary territorial unit in the formation of assembly districts, and members of the Assembly must first be apportioned to counties, the above provision of section 3, as applied to the formation of assembly districts must be construed to mean that there must be substantial equality of representation, in proportion to population, as between all the different counties, and districts composed of two or more counties; that is to say, there must be no unnecessary inequality in the proportionate representation in the Assembly of counties and of such districts on the basis of population.

"Each county and each district consisting of two or more counties having a population equal to the numerical unit of representation in the Assembly (alleged to be 16,868), is entitled absolutely to one member of Assembly unless it should be found necessary to place a county not thus entitled to a member in a district with a county which would otherwise of itself be entitled to one member. It is believed, however, that no necessity exists for forming such a district in the apportionment based on the enumeration of 1890. For each multiple of such numerical unit reached by the population of any county, such county is also absolutely entitled to an additional member of Assembly."

In Sherrill v. O'Brien, 188 N. Y. 185, 208-9, 211, an action by mandamus involving the validity of an apportionment of the State for senators, under which Queens county with a population in excess of the senatorial ratio had been joined to Richmond county forming the second district, and in which the Thirteenth district, a subdivision of the county of New York, was

not compact in shape, the court through CHASE, J., says:

"The citizen population of the State as shown by the enumeration of 1905 was 7,062,988. Dividing this number by fifty, as provided by the Constitution, gives a ratio of 141,259 for apportioning senators. With such ratio it appears that the county of New York was entitled to twelve senators; the county of Kings to eight and the county of Erie to three, in which counties the average citizen population to a district would be, respectively, 150,024, 147,347 and 146,192, and the county of Kings was entitled to one senator more than the number specifically provided for by the constitution as adopted in 1894, and under the new constitutional provision it increased the full number of senators in the State from 50 to 51. Deducting from the entire citizen population of the State the citizen population of the counties of New York, Kings and Erie, there remains a citizen population in the other counties in the State of 3,645,337, which, divided by 28, the number of senators outside of the counties of New York, Kings and Erie, gives a ratio for each senatorial district of 130,190. The counties other than New York, Kings and Erie, having a citizen population in excess of the ratio for apportioning senators are Queens, Westchester, Albany, Rensselaer, Oneida, Onondaga and Monroe. Each of these counties having a citizen population in excess of the ratio is entitled by any just and reasonable construction of the Constitution to at least one senator. [State ex rel. v. Cunningham, 81 Wis. 440; Parker v. State ex rel., 133 Ind. 178.]

"The minimum rights of such counties were determined by the enumeration and they could not be taken away by an exercise of discretion by the Legislature at least unless the geographical position of some small county was such as to make it absolutely necessary that it be joined with some one of such coun-

ties.    No such absolute necessity required that Rich-
mond county be joined to Queens county, or to any
other county having its full ratio.    Joining Richmond
county to Queens county to make the second senatorial
district was an exercise by the Legislature of an arbi-
trary power not authorized by the Constitution.

"The disregard of constitutional provisions in
forming the Second and Thirteenth senate districts
is clear, and they so affect the entire apportionment as
to make it necessary to declare the act wholly uncon-
stitutional and void."

In Parker v. State ex rel., 133 Ind. 178, l. c. 192-
196, the court said:

"Assuming, therefore, that the question is pre-
sented in such a manner as to require a decision, we
proceed to an examination into the several provi-
sions of what is known as the apportionment act of
1891, and to a comparison of such provisions with the
sections of our State Constitution with which it is
claimed they conflict.    Before such comparison can
be had, it is necessary to set out and analyze the pro-
visions of the Constitution upon the subject of appor-
tioning the State for legislative purposes.

"Section 2, article 4, provides that 'the senate
shall not exceed fifty nor the house of representatives
one hundred members; and that they shall be chosen
by the electors of the respective counties or districts
into which the State may, from time to time, be di-
vided.'

"Section 4 of the same article provides that 'the
General Assembly shall, at its second session after
the adoption of this Constitution, and every six years
thereafter, cause an enumeration to be made of all
the male inhabitants over the age of twenty-one years.'

"Section 5 provides that 'the number of senators
and representatives shall, at the session next follow-
ing each period of making such enumeration, be fixed
by law, and apportioned among the several counties

according to the number of male inhabitants above twenty-one years of age in each: Provided, That the first and second elections of members of the General Assembly, under this Constitution, shall be according to the apportionment last made by the General Assembly before the adoption of this Constitution.'

"Section 6 provides that 'A senatorial or representative district, where more than one county shall constitute a district, shall be composed of contiguous counties; and no county, for senatorial apportionment, shall ever be divided.' We think it was the intention of the constitutional convention to secure to the electors of the State, by the provision above referred to, an equal voice, as nearly as possible, in the selection of those who should make the laws by which they were to be governed. The General Assembly has no discretion, in our opinion, to make an apportionment in disregard of the enumeration provided for by the Constitution.

"The enumeration required is not of the citizens generally, but of the inhabitants authorized to vote; and unless the General Assembly is to be governed by the enumeration, when made, in the matter of districting the State for legislative purposes, the enumeration is a useless ceremony, and an unnecessary expense. The purpose in requiring the enumeration is to fix the number of voters in each county, at the time the apportionment is made, in order that the Legislature may form districts so as to secure to each voter, as nearly as may be, an equal voice with every other voter, in the State, in the selection of senators and representatives. The cardinal principle of free representative government, that the electors shall have equal weight in exercising the right of suffrage, is recognized and secured. Representation according to population is the rule fixed by these several provisions of our Constitution, and the General Assembly has no more discretion, in our opinion, to disregard

this rule than it has to disregard any other plain provision found in that instrument. The enumeration, at the short periods of six years, was intended to secure a readjustment and correction of the inequalities that might arise from the growth or shifting of the population within that period.

"In argument it seems to be agreed that it was the intention to provide that, in making an apportionment among the several counties for legislative purposes, the integrity of the counties, when possible, should be preserved. This, we think, is true; and when that is done, it is plain that exact equality cannot be secured. But, because exact equality is not possible, the General Assembly is not excused from making such an apportionment as will approximate that equality required by the organic law of the State.

"A question somewhat similar to the one now under discussion arose in the Congress of the United States, in the year 1832, relative to the construction to be placed upon section 2, article 1, of the Constitution of the United States, which provides that, 'representatives and direct taxes shall be apportioned among the several States which may be included within this Union, according to their respective numbers,' etc. The committee, to whom was referred the question as to what was the constitutional method of apportioning unassigned representatives as between the States having fractions of population less than a full ratio, was of the unanimous opinion that the loss of members arising from the residuary numbers should be made by assigning as many additional members, as are necessary for that purpose, to the States having the largest fractional remainders.

"Upon that occasion Mr. Webster said: 'The Constitution, therefore, must be understood, not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring Congress to make an apportionment of represen-

tatives among the several States, according to their respective numbers, as nearly as may be. That which cannot be done perfectly must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the nearest practicable approach to exactness ought to be made. Congress is not absolved from all rule, merely because. the rule of perfect justice cannot be applied. In such a case approximation becomes a rule; it takes the place of the other rule, which would be preferable, but which is found inapplicable, and becomes itself an obligation of binding force. The nearest approximation to exact truth, or exact right, when that exact truth or exact right cannot be reached, prevails in other cases, not as a matter of discretion, but as an intelligible and definite rule, dictated by justice, and conforming to the common sense of mankind; a rule of no less binding force in cases to which it is applicable, and no more to be departed from than any other rule.' The rule recommended by this committee was subsequently adopted by Congress, so that representatives are now apportioned among the several States of the Union under it as a fixed and binding obligation.

"The rule here announced is, we think, the true one. When it is found that exact equality cannot be attained, where the integrity of the counties is preserved, approximation becomes a rule as binding upon the General Assembly as any other rule fixed by the Constitution.

"It is said, however, that as to the fractions of the representative unit, the Constitution is silent, and that, therefore, the General Assembly has a discretion to provide for the representation of such fractions or to leave them unrepresented.

"That is true in a limited sense only. The Constitution requires that the State shall be reapportioned every six years according to the male inhabitants over the age of twenty-one years in each county. It con-

templates the formation of districts, each embracing as nearly as possible an equal number of the electors of the State. But the rule requiring an approximation to equality forbids the formation of districts containing large fractions unrepresented where it is possible to avoid it, while other districts are largely over-represented. That the General Assembly has much discretion in the disposition of the fractions of the unit of representation cannot be doubted, but it is not a discretion beyond control. In so far as the Constitution secures equality in representation, it is not silent as to the disposition of fractions, and the Legislature must dispose of them with a view of securing that end, otherwise an apportionment could be made which would give to one portion of the State nearly double the representation given to other portions. Constitutional provisions are seldom, if ever, to be construed as merely directory.''

We are also of the opinion that the act of apportionment, as before stated, violates the Constitution, in that it does not conform to that provision which requires compactness of counties.

At another place, we have set out a map of several of them, which shows a total disregard of this Constitutional provision.

Heretofore, I quoted quite liberally from the opinion in the case of People v. Thompson, supra, treating among other things the failure of the Legislature of that State to obey the constitutional requirements, that in the formation of senatorial districts, the counties composing them should be contiguous and as compact as the nature of the work would reasonably permit. That language is peculiarly applicable to the facts of this case.

There as here, the evident intention of the people of the State, as manifested in said constitutional provision, is, that when counties are combined to form a district, they must not only touch each other, but

they must be closely united territory, and thereby guard, as far as practicable, the system of representation adopted in the State, against the legislative evil commonly known as the "gerrymander."

In the republican form of government, each citizen should have an equal voice in the enactment of the laws, their interpretation and execution. This is the true spirit and meaning of our Constitution and laws, and the judge upon the bench, in construing and giving them effect, should put aside party feeling and be governed solely by the spirit of the old proverbial saying: *"Tros Tyriusque mihi nullo discrimine agetur."*

Inequality of representation in a republican form of government, is just as offensive and unjust, as is taxation without representation. Both are repugnant to and inconsistent with the American idea of government and true citizenship.

We have also quoted quite extensively from other authorities cited in this case, first, because the importance of the case demands a careful and full consideration of all the propositions presented; and, second, because what has been said by those able courts upon similar questions to those under consideration, applies equally well to this case, and they more fully express my views of the law governing the case than I could hope to do myself.

We are, therefore, of the opinion, that the act of apportionment is unconstitutional, null and void, and consequently the respondents cannot be required to obey it, by commanding them to subdivide the city of St. Louis into six senatorial districts, as is provided for by said act.

III. There is another reason, not assigned, however, by counsel, why the respondents should not be required to subdivide the city of St. Louis into senatorial districts, and that is this: We held in the first paragraph of this opinion that under section 7 of article 4 of the Constitution, the Governor, Secretary of

State and Attorney-General, in so far as apportioning the State into senatorial districts was concerned, were a Miniature Legislature, and consequently it could no more be compelled by mandamus to redistrict the State, than the Legislature proper could be.  Now by section 6 of the same article the circuit courts in those counties which are entitled to more than one senatorial district, are required to subdivide those counties into the number of districts each is entitled to under the general apportionment.

From this it is seen, that the circuit courts of those counties are clothed with the same authority that the Governor, Secretary of State and Attorney-General have in regard to redistricting the remainder of the State; and if the courts have no authority to mandamus the latter, which clearly they have not, then by parity of reasoning they have no authority to mandamus the former because both are exercising legislative discretion.

We are, therefore, of the opinion, that the peremptory writ of mandamus should be denied, and that the alternative writ heretofore issued should be quashed; and it is so ordered.

All concur, but *Valliant, C. J.*, not for the reasons stated in the opinion, but for the reasons stated in separate opinion in which *Graves, J.*, concurs, and also in separate opinion filed by him; *Kennish, J.*, does not concur in what is said regarding the Campbell case.

## SEPARATE OPINION.

VALLIANT, C. J.—This is an application to this court to issue its original writ of mandamus to compel the respondents, judges of the circuit court of the city of St. Louis, to divide the city into senatorial districts. Relator is a citizen and taxpayer in the city.  In November, 1911, relator filed a petition in the circuit court

of the city asking the court to proceed to divide the city into senatorial districts as required by section 6 of article 4 of the Constitution, but the court refused the petition. Thereupon relator came to this court for a writ of mandamus, and on his petition an alternative writ issued. To that writ the respondents have filed a return stating that they refused to divide the city into senatorial districts for the reason that in their opinion there has been no valid apportionment of the State, that the apportionment made does not conform to the requirements of the Constitution as to compactness of territory or ratio of the population, and also that it was not signed by the Governor or proclaimed by him. Relator moves for a judgment on the pleadings.

The question on the threshold is, has this court jurisdiction of the case stated in the pleadings? Counsel for respondents in their brief say: "This is a proceeding by mandamus to test the validity of an apportionment of the State into senatorial districts contained in a certain statement of the districts filed in the office of the Secretary of State on April 18, 1911." That is doubtless the purpose of the suit, but if this court has no jurisdiction of the case it cannot pronounce judgment on the point in dispute and therefore anything that we might say on the subject would be simply the opinion of individuals.

We are satisfied we have no jurisdiction of the case presented. The relator is a citizen and taxpayer, having no more personal interest in the matter than any other citizen and taxpayer, having no official duty in connection with the matter, and what he is asking is that the judges of the circuit court, on whom a particular duty is imposed by express provision of the Constitution, be required to perform that duty. The duty so imposed, although it is laid on the circuit court, is not judicial in its character and could not be imposed on the court by any authority less than the Consti-

tution itself. The duty is purely legislative in its character and could be performed only by the General Assembly, but for the express provision referred to. In the briefs of counsel references are made to decisions in other States bearing on the question of the power of the courts to pass on the question of the validity of acts of a Legislature making apportionments of the State for representatives and senatorial districts. We will in the course of this opinion refer to some of those cases, but before doing so we deem it important to note particularly the requirements of our own Constitution which, though having in some respects features of similarity to others, has its own features of especial prominence.

The division of the powers of the State government are emphasized in a separate article too plain to admit of question: ''Article 3. The powers of government shall be divided into three distinct departments —the legislative, executive and judicial—each of which shall be confided to a separate magistracy, and no persons or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others except in the instances in this Constitution expressly directed or permitted.'' There we have, first, a separation of powers, then a confiding of power, then a forbidding to exercise a power confided to another. Perhaps if article 3 had been omitted from the Constitution and articles 4, 5 and 6 inserted defining the duties of the three several departments, these articles, taken together, might be interpreted to mean that power of a separate character was confided exclusively to each, and, impliedly, that each was to keep its hands off the other, but if so the insertion of article 3 only emphasizes the anxious determination of the framers of our organic law to keep each department within its own bounds and leave the two others, each for itself, to perform the duty confid-

ed to it.  That does not mean that either department
in the performance of the duty confided to it may act
contrary to the mandate of the Constitution, but it
does mean that neither of the other two shall exercise
the power confided to that one.  The court may, in a
concrete case, pronounce judgment on a question of
the validity of a legislative act, but it cannot commit a
legislative act, nor can it compel a legislative body to
act.

Article 4 of the Constitution is devoted to the legis-
lative department of the State government and it is
that article alone that provides for the dividing of the
State into representative and senatorial districts. Sec-
tion 6 of article 4 provides that "when any county
shall be entitled to more than one senator, the circuit
court shall cause such county to be subdivided into
districts of compact and contiguous territory," etc.

It is not given the circuit court to determine how
many senators the county may have; that is left to the
General Assembly in the first place, and failing the
General Assembly to act, "it shall be the duty of the
Governor, Secretary of State and Attorney-General,
within thirty days after the adjournment of the Gen-
eral Assembly on which such duty devolved, to per-
form said duty."

Article 5 of the Constitution ordains: "The execu-
tive department shall consist of a Governor, Lieutenant
Governor, Secretary of State, State Auditor, State
Treasurer, Attorney-General and Superintendent of
Public Schools."

It was, as above said, on three of those executive
officers that the duty of dividing the State into sena-
torial districts devolved, on the failure of the General
Assembly to act.    Suppose those three officers had
failed entirely to perform that duty, what could the
court do about it?  The duty that they were to perform
was a duty that devolved in the first instance on the

241 Mo.—33

General Assembly and, but for this alternative provision, could be performed by no other magistracy. Suppose there was no such alternative provision, could the court by mandamus compel the General Assembly to perform that duty? The duty in the hands of the three executive officers was the very same as that devolved on the General Assembly, it was legislative work; in the language of the Constitution when performed "the same shall be as binding and effectual as if done by the General Assembly." Suppose they had refused to act in the matter at all, could we by mandamus compel them to act? Or if we should issue the writ and they should refuse to obey it what could we do? We are told that in this instance the Governor, for reasons that he thought right and just, refused to sign the document which the two other officers signed, and he refused to make the proclamation which respondents say was necessary; suppose we should think the Governor's signature and proclamation were necessary and suppose we should arrogate to ourselves the right to review the Governor's reasons and come to the conclusion that his reasons were unsound and that he ought to sign the paper and issue the proclamation, could we by mandamus compel him to do so? It will not do to say that it will only be necessary for this court to express an opinion on the point on which an opinion is asked and that all parties interested will bow; courts do not render judgments that will depend for satisfaction on the pleasure or complaisance of the parties against whom the judgment is rendered. The very fact that the court cannot enforce its judgment shows that the court has no jurisdiction of the subject. The three executive officers named might wholly fail to perform their duty and the court could do nothing to compel them. In one of the cases cited by respondents in support of the proposition that the courts have authority in a proper concrete case to pass judgment on the constitutionality of an act of appor-

tionment made by the General Assembly, and which does so hold (People ex rel. v. Thompson, 155 Ill. 451) the court said: "That there are many constitutional duties imposed upon other departments of the government which cannot be enforced by the courts, and the manner of compliance with which is left to the sole and final determination of the department upon which the duty is imposed, will not be denied, . . . Nor have the courts any power to compel the Legislature to act in any case, however imperatively the duty may be imposed on that body to act, so that if the Legislature should wholly neglect or refuse to pass an apportionment act after the lapse of ten years, and should leave in force an act under which the districts had become grossly unequal in population, the people would have no remedy outside of a constitutional amendment, except to elect a General Assembly which would perform the duty." In Missouri our Constitution provides that if the General Assembly fails to perform the duty, the three executive officers named shall perform it, but if they fail also there is no remedy that the courts can apply. And if the three officers meet and essay to perform their duty, but in doing so fail to follow the mandates of the Constitution, the court cannot lay its hands upon them and force them to make an apportionment in accordance with what it deems proper. Suppose we should go into the subject and conclude that the apportionment in question is unconstitutional, how are we going to remedy it? Suppose we had authority to say, and should say, that this apportionment is unconstitutional, what else could we do, what would be the result?

In another one of the cases cited by respondent (People ex rel. v. Rice, 135 N. Y. 473), the court said: "It is said that courts have no right to look at the consequences which may follow their decision of legal questions. This is quite an erroneous statement of the principle. After a decision has been come to, it is

true the courts have nothing to do with consequences. But in seeking for a correct solution of any legal question, especially the question of the proper construction of a statute or a constitution, the result which may follow from one construction or another is always a potent factor, and is sometimes in and of itself conclusive. . . . We have a right to consider the evil which would result from the prevalence of the alternative.'' The question in that case was whether an Act of 1879 or an Act of 1892 was the lawful apportionment act; the court said: ''We are asked to say that in this act of 1892 the Legislature has abused or overstepped the discretion devolved upon it by the Constitution. What is the result that would follow? In the first place we should have every enumeration and every apportionment act brought before the courts for review, and it would not be necessary to act immediately, any citizen at any time during the running of the decennial period would have the right to invoke the aid of the court to set aside as void any such act, and leave the people to suddenly confront such a situation as is now presented. . . . The greatest confusion and disorder would result from a holding that this act is invalid.''

So in the case before us, if we should go into the subject and conclude that the apportionment made by the Secretary of State and Attorney-General is invalid, and so declare, and if our judgment were binding on anybody, where would the people go to find an apportionment that is valid? We have no authority to compel these officers to meet again and make another apportionment and if we go back to the apportionment made ten years ago we might find that as faulty in some respects as this one, besides the fact that the growth and shifting of the population in the ten years past had rendered it inappropriate to existing conditions. The evil that would result from the exercise of such a power by the courts shows that the framers of our

Constitution never intended the courts to interfere in such matter.

The circuit court in performing the duty imposed in article 4 does not act in a judicial capacity; it is not required that parties litigant having personal rights to be adjudged, or official duties to be directed, should appear, but that the judges composing that court should come together of their own motion and perform that legislative function. In the case stated in the pleadings there were no parties litigant before the circuit court, nobody's private rights of person or property were in issue, there was nothing to call into action judicial powers.

· The legislative duty to be performed by the judges is special and limited. Authority is not given them to determine how many senators their city is entitled to have; they in their legislative capacity have no authority to review or pass judgment on the act of apportionment made either by the General Assembly or the three executive officers; their duty is simply to divide the city into as many senatorial districts as there are senators apportioned to the city. In this case they say that for reasons which they assign they will not divide the city into senatorial districts; if they will not, that is the end of it, whether their reasons are good or bad; we have nothing to do with it; they are *pro hac vice* a part of the legislative department of the State and beyond our reach.

Whether, in a proper concrete case made, an apportionment made by the General Assembly can ever be questioned in court on the ground of its constitutionality cannot be decided in this case because no such concrete case is now here. Without yielding the point that every act of the General Assembly is liable to assault in court on the ground that it is unconstitutional, we may say in reference to an apportionment act that there is a large discretion given to the Legislature in the exercise of the power to make the apportionment

and that as long as the act challenged is within the bounds of that discretion it cannot be held to be unconstitutional. The cases cited by respondents point out that fact. Just how a case could be made to bring the question before the court it is not for us now to say, but some light on that subject may be obtained by reference to some of the cases cited by respondents. People ex rel. v. Thompson, 155 Ill. 451, was a suit at the relation of the State's Attorney for that county against the county clerk, to compel him to issue notices of election to be held October 15, 1894, under the apportionment act of 1882, the petition stating that the apportionment act of 1893, was unconstitutional. The clerk had issued notices of election as called for in the Act of 1893. The question was whether the election was to be held under the apportionment act of 1882 or that of 1893. The court held that the Act of 1893 was valid. It was in that case that the language we have above quoted from the Illinois court was used. In People ex rel. v. Carlock, 198 Ill. 150, relator was a candidate for the office of representative in the General Assembly; defendant was the county clerk and as such refused to file relator's certificate of nomination on the ground that the act of the Legislature making the apportionment of 1901 was uncostitutional, and that the Act of 1893 was the valid law. The court held that the Act of 1901 was the valid act.

State ex rel. v. Cunningham, 81 Wis. 440, was a suit by the Attorney-General against the Secretary of State to enjoin him from giving notice of election under the apportionment Act of 1891. The court held that the act was unconstitutional and sustained the injunction. State ex rel. Lamb v. Cunningham, 83 Wis. 90, was a suit by a private citizen as relator against the Secretary of State to restrain him from issuing notices of election and from filing and preserving in his office certificates of nominations, etc., on the ground that the

apportionment was unconstitutional. The court sustained the injunction.

People ex rel. v. Rice, 135 N. Y. 473, was a suit by mandamus against the Secretary of State requiring him to issue notices of election under the apportionment Act of 1879 and restraining him from filing election returns under the Act of 1892. The question was whether the Act of 1879 or that of 1892 was the law. The court held that the Act of 1892 was valid and denied the mandamus. It was in that case that the language of the New York court above quoted, in reference to the consequences that would result from declaring an act of apportionment invalid, was used.

Whilst, as already said, there is some similarity in the constitutions of other States and ours on this subject, yet there is also sufficient difference to account for the difference in the decisions. By the Constitution of New York adopted in 1894 it is expressly provided that: "An apportionment by the Legislature, or other body, shall be subject to review by the Supreme Court at the suit of any citizen, under such reasonable regulations as the Legislature may prescribe." That constitutional provision was not in force when the case of People v. Rice, supra, was decided, but the insertion of that provision in the Constitution of that State seems to indicate that it was thought by the framers of that Constitution that without it power to review such facts did not exist in the courts. We have nothing of that kind of our Constitution.

Viewing the judges of the St. Louis Circuit Court in the character of an arm of the legislative department of the State in respect of the duty imposed on them by section 6 article 4 of the Constitution, we hold that we have no more authority to compel them to perform that duty than we would have to compel the General Assembly to perform its part of the same act, or to lay our hands on the chief executive and the other executive

officers and compel them to perform their part of the same act.

For this reason the writ of mandamus should be denied.

*Graves, J.,* concurs in these reasons for denying the writ, and in separate opinion adds some further views of his own.

### SEPARATE OPINION.

GRAVES, J.—I fully concur in the elegantly expressed views of the learned Chief Justice in this case. Such views dispose of the case and properly dispose of it without a mass of mere *obiter.* The principal opinion of our learned associate is full of questions which should not be discussed, because the discussion thereof is but *obiter dictum,* and does not bind this court nor any other body. The third and last paragraph of the opinion written by our learned brother WOODSON, in twenty-two lines not only disposes of the case, as it should be disposed of, but such paragraph makes all that precedes it *obiter dictum* pure and simple. These questions, so discussed, should be left for a live case, in which a discussion of the questions would rise from the plane of pure *obiter* to that of judicial decision.

The universal rule of this court on such question has been well expressed by our brother LAMM, in Donnell v. Wright, 199 Mo. l. c. 313, whereat it is said: "In leaving this view of the matter, it should be said (to guard against misunderstanding) that the question is not here, and, therefore, we do not decide, that an opinion of this court holding plaintiff has no case at all on the facts and the law, which opinion is followed by a judgment of reversal only, leaves the identical issue on the identical facts open to re-agitation in a new suit—it being meet to dispose of that question only when reached as a live matter in a live case, and not *obiter,* or by the by."

So we say in the case at bar. Both the opinion of the learned Chief Justice and of our learned associate say that we have no jurisdiction of this case. Both opinions say that the respondents in this case in the matter of arranging the senatorial districts in the city of St. Louis are performing a purely legislative function over which this and no other court can, under our Constitution, exercise superintending control.

Under our Constitution one branch of the State government is prohibited from interfering with and trespassing upon the duties imposed by the Constitution upon the other branches thereof. The legislative function cannot be regulated by judicial action. We cannot compel legislative bodies to act, nor can we enjoin them from acting. This is a subject-matter beyond the jurisdiction and power of this court. When we are asked to either mandamus or enjoin a legislative body, the only reply we can make, is, that, under the Constitution, the subject-matter is beyond our jurisdiction. That is what should be done in this case and what is done by both opinions. Then why discuss a lot of questions in a case over which we have no jurisdiction. Why say the case is one over which we have no jurisdiction, and yet proceed to pass upon the alleged merits?

Such discussion decides nothing, because it is mere *obiter.* Especially should it not be done in this case where the parties in actual interest have never been heard in this court.

If the question of gerrymandering senatorial districts were properly before us, and if the beneficent doctrine of estoppel could be invoked, then respondents and their predecessors in office would certainly be estopped from charging the political offense of "gerrymandering." Courts can take judicial notice of senatorial districts and their boundaries. With such notice we would be forced to say that the most ill constructed senatorial district in the State (outside of the

cities) would pale into insignificance when compared
with some of those to be found in the city of St. Louis,
which latter are the handiwork of respondents or their
predecessors in office. But this is a question not in
this case, because this court has no jurisdiction of the
subject-matter of this action, i. e., no jurisdiction of
a case which seeks to have us compel a legislative body
to act.

For these reasons, I concur in the views expressed
by the Chief Justice.