—O—

## ON MOTION FOR RECONSIDERATION

No. M-64-1.     Decided April 9, 1964.

*Santos P. Amadeo, Arturo Ortiz Toro, Antonio Quirós Méndez* for petitioners.

PER CURIAM: Although usually we do not give the reasons for our refusal to issue a writ, *cf. Resto v. Superior Court*, 80 P.R.R. 1 (1957), petitioners' reiteration in their motion for reconsideration of certain statements which are altogether erroneous from a point of view of law and of right and the importance of the issues raised as well as to

make a proper orientation of public opinion in this case, justify our departure from that practice.

The Statehood Republican Party of Puerto Rico and Senator Armando Schmidt prayed for a writ of mandamus against the Board created by Article III, § 4 of the Constitution of Puerto Rico,[1] "requesting a hearing in which they could ask the respondent Board for the protection of their political rights, inasmuch as the plan to revise the senatorial and representative electoral districts to be approved by the respondent Board is not subject to judicial review by the courts of Puerto Rico . . . ." Said Board is entrusted with the revision, after each decennial census beginning with 1960, of the electoral division of the Commonwealth subject to the rules established in the aforesaid section.

It is alleged in the petition that the Board is considering a plan for the electoral division of Puerto Rico and that "the plan . . . violates the rules established by Article III, § 4 of the Constitution of Puerto Rico in connection with the revision of the senatorial and representative districts of Puerto Rico."

■ Traditionally, the apportionment of population into electoral units is a legislative function. *State* v. *Mooney*,

---

[1] The above-mentioned constitutional provision reads thus:

"In the first and subsequent elections under this Constitution the division of senatorial and representative districts as provided in Article VIII shall be in effect. After each decennial census beginning with the year 1960, said division shall be revised by a Board composed of the Chief Justice of the Supreme Court as Chairman and of two additional members appointed by the Governor with the advice and consent of the Senate. The two additional members shall not belong to the same political party. Any revision shall maintain the number of senatorial and representative districts here created, which shall be composed of contiguous and compact territory and shall be organized, insofar as practicable, upon the basis of population and means of communication. Each senatorial district shall always include five representative districts.

"The decisions of the Board shall be made by majority vote and shall take effect in the general elections next following each revision. The Board shall cease to exist after the completion of each revision."

247 S.W.2d 722 (Miss. 1952). Occasionally, constitutions create instrumentalities entrusted with the apportionment subject to certain requirements. It is so in our Constitution. That function, even if performed by a special instrumentality, is still a legislative function. *State v. Sathre*, 110 N.W.2d 228 (N.D. 1961).

The case just cited presents a situation similar to the situation in the instant case. The Constitution of North Dakota provides that the function of dividing the state into electoral units shall be performed by the Legislative Assembly, but that if the latter shall fail to act, it shall then be performed by a commission composed of the Chief Justice of the Supreme Court, the Attorney General, the Secretary of State, and the majority and minority leaders of the House of Representatives, within 90 days after the adjournment of the Legislature. The Chief Justice shall issue a proclamation and the plan adopted by this group shall have the same force and effect as though made by the Legislative Assembly. The Legislative Assembly of North Dakota failed to act and the aforesaid commission took over. A citizen appeared before the Supreme Court and alleged that the commission was about to adopt an apportionment plan and that the aforesaid plan was arbitrary, illegal, and unconstitutional. He prayed the court for a writ enjoining the Chief Justice from issuing the proclamation to enforce the plan. In refusing to issue the writ the Court stated:

"Here, the group composed of the Chief Justice, the Solicitor General, the Secretary of State, and the majority and minority leaders of the House of Representatives are acting as a miniature legislature and are performing a function which the Legislature itself should have performed. The apportionment group's action has the same force and effect before the law as any action of the Legislative Assembly would have had. In answer to the petitioner's argument that the group's action is complete, we point to the fact that no record is required by the Constitution to be made. There is no provision for the

filing of the results of the apportionment group's deliberations with the Secretary of State or with any other officer. The only means provided for announcing or publishing the plan of apportionment which will finally be adopted, or which may be decided upon by the group, is the proclamation of the Chief Justice. When that proclamation is issued, it will be the last act of the legislative process that devolves upon this group, and such proclamation will terminate the group's action with respect to apportionment. *Until such proclamation is issued, the action of the group is not subject to challenge in the courts.* State ex rel. Barrett v. Hitchcock, 241 Mo. 433, 146 S.W. 40.

"Thus the action of the apportionment group is clearly legislative. Since such action is subject to change at any time until issuance of the proclamation by the Chief Justice, and therefore is incomplete at this time, any action to enjoin the issuance of the proclamation would be an interference by the judicial branch of the government with the constitutional functions of the legislative branch." (Italics ours.)

■ ■ Just as in the foregoing case, we cannot interfere with the respondent Board. By constitutional provision it is performing a legislative function and until it has completed it, courts may not interfere.[2] As stated in *Sathre*:

"This court has heretofore held that it is no part of the judicial function to interfere with the constitutional processes of legislation, and that it will not entertain a suit to test the constitutionality of a proposed act of the Legislature on the ground that, if such act is enacted, it will interfere with the constitutional rights of the litigant."

It goes without saying that should the plan finally adopted be contrary to the constitutional provisions, any interested party may seek relief from the courts.[3]

---

[2] Interference by the courts would not be barred to force the Board to comply with the ministerial duty prescribed by the Constitution.

[3] In the very case of *Sathre*, after approval of the plan by the group presided over by the Chief Justice of North Dakota, the case was taken to the courts challenging the approved plan, which was declared null and void. *State v. Sathre*, 113 N.W.2d 679 (N.D. 1961) and *Wesberry v. Sanders*, 376 U.S. 1, 8 L.Ed.2d 481 (1964).

■ Moreover, in this case a writ of mandamus is prayed for and mandamus lies only to enforce compliance with a ministerial duty clearly specified by law or the Constitution. Neither the law nor the Constitution contain a provision ordering the Board to hold hearings.[4] *Espina* v. *Calderón, Judge; Heirs of Espina, Ints.*, 75 P.R.R. 71 (1953); *Rivera* v. *Hernández*, 70 P.R.R. 521 (1949); *Vicenty* v. *Board of Trustees, etc.*, 45 P.R.R. 96 (1933).

The motion for reconsideration will be denied.

Mr. Chief Justice Negrón Fernández and Mr. Justice Hernández Matos did not participate.

---

[4] In the Rules adopted by the Board it is provided:

"Rule 6. Public Hearings.

"Whenever it shall be determined by the Board, the latter shall hold public hearings, which shall be called by means of the publication of a proper notice in, at least, two newspapers of general circulation in the Island . . . ."

As alleged in the petition for mandamus itself, the Board determined that it should and did hold public hearings on June 11, 12, and 13, 1963, which were attended by various citizens who expressed their ideas as to how the senatorial and representative districts ought to be revised.